## TUMMALTY *vs.* TUMMALTY.

### *In the matter of the Estate of* JOHN TUMMALTY, *deceased.*

In a matrimonial case there is no need of proving a ceremonial marriage; and although formal nuptials in *facie ecclesiæ* may be falsely claimed, the disproval of the claim does not disprove the existence of the marital relation, provided the contract can be shewn from cohabitation, reputation, and other circumstances.

Where a man and woman under claim of being married at a particular time and place, kept house and cohabited publicly as husband and wife for ten years, two children having been born during the connection,—*Held*, that the circumstances were sufficient to raise the presumption of marriage, notwithstanding the ceremonial nuptials claimed to have taken place, might be disproved.

W. C. FREEMAN,
JAS. G. McADAM, *for Widow.*
JOHN E. DEVELIN, *for Contestants.*

THE SURROGATE.—This is a contest as to the right of administration between the husband of a sister of the deceased, and Alice, claiming to be his widow. The marriage of the decedent with Alice is denied, and no ceremonial marriage has been proved. It appears that the decedent and Alice were acquainted in Ireland, and left their native country together in a steamer for Liverpool, in 1844, in company with her brother. From Liverpool they sailed for New York, and continued to reside here until Tummalty's decease in the month of May last. A number of witnesses testify that the decedent stated that he had married Alice at Liverpool; one of them says, the night before they took ship for this city. Another witness states that Alice told the same story shortly after her arrival here. On the other hand, two witnesses depose that

the decedent, within a month or two after his arrival, denied that he was married. Philip Carlin, one of these, testifies that Tummalty, a few days after he came to this country, boarded with him at his house in Willett street: that he asked permission to bring a girl to board there named Alice Riley, who had come over in the same ship with him—that he gave his consent, and she occupied a separate room three or four weeks. Carlin, having suspicions of a connection between them, questioned Tummalty on the subject, who told him he was not married to her, and never intended to be. The decedent then went to the country for a short period, and Alice left Carlin's house. In a month or two they both returned, and, on Carlin's objecting to their stay at his house, the decedent said he would marry her the next day. On the next afternoon " he told her to get ready, they started off, and when they came back," he says, " he introduced her to me as his wife. He said they had got married. That night he stopped at my house. They slept together, after drinking some wine. That was the first time he ever told me he and Alice were married, and the last time I ever asked them." There is evidence of the decedent's statement that this marriage took place in St. Mary's Church, and by " Father Starrs," and an effort was made to disprove the truth of this declaration by producing the records of the church. The Rev. William Starrs, the Pastor of that church, stated that there were two other officiating clergymen at that period besides himself, " one of them always entered the marriages in this book—the other did not I believe at all times." I see no occasion, however, for speculating very closely on the possibility of errors in this record, nor does it seem to me important to determine whether the decedent was married to Alice in Liverpool or in St. Mary's Church in New York, or at neither place. The prominent facts in this case are beyond controversy, and are of such a character that a marriage at either place may be excluded. There is no need of proving a ceremonial marriage, and although formal nuptials in *facie ecclesiæ*, may be falsely claimed, the disproval of the

claim does not disprove the marital relation. If a man says, this woman is my wife, I acknowledge her as such, cohabit with her, and hold her out to the world as my wife, and I married her at such a place, the venue may be disproved without at all impairing the obligation of the contract. In other words, the formal ceremony at the place named may be falsified, but the marriage is not. And this arises from the purely civil nature of this contract. It requires nothing more than the simple consent of the parties—and that consent can be shown the same as any other agreement, by mere words of present contract, by declarations and acts; or by a continued course or habit of living, by cohabitation as man and wife, and by reputation. Now it is agreed that shortly after the decedent introduced Alice to Carlin as his wife, the young couple proceeded to housekeeping. The proof shows that they lived together as man and wife till Tummalty's decease, that they had two children, both of whom were baptized, Rose Tummalty one of the contestants in this case, assisting at the ceremony of one as a sponsor—that the decedent introduced, recognized, and treated Alice universally as his wife; and now after nearly ten years of such cohabitation, when the husband's head is laid in the dust, his sister raises this charge against the honesty of his wife and the legitimacy of his children, mainly resting it on conversations with two persons, at a period sufficiently remote to render the memory somewhat fallible. I never saw a more groundless case of opposition. It is of no kind of consequence what story the decedent told as to the place of his marriage, nor whether those statements were true or false. It is enough that he acknowledged the woman as his wife and lived with her in that relation—that she bore him children, whom he had baptized in his name; and that by his acts and declarations he proclaimed to the world that the connection between them was not meretricious. No proof could be more convincing of a marriage in fact than this, and it cannot be overturned by any amount of testimony as to the private declarations of the husband, made previous to his cohabiting with this woman

as his wife. Society would not be safe for a moment, in this, the most sacred of its relations, if an open and public cohabitation as man and wife for ten years, continued with all the conventional usages of married life, and followed by the procreation of children, could be overturned by relating stale conversations and private statements of the husband as to the particular mode of the inception of the relation. The single question in all these cases is this—was there a contract between the parties to live together as man and wife? The law does not require to know when and where the agreement was made. Though words of contract *in præsenti* are sufficient, no witness is requisite, nor need the time and place be pointed out. Curiosity may be gratified with these details, but justice is satisfied by having the existence of the contract determined. And it is not unworthy of observation that where the relation between man and woman does not appear to have been casual or occasional, the law leans to a charitable conclusion, and favors the presumption of its legitimate character. There are many cases in the books where that charity has been largely exercised, but I see no reason to invoke it in the present case. The proof is entirely satisfactory to my mind, that the party claiming to be the decedent's widow, was his lawful wife, and is entitled to administration upon his estate. There must be a decree to that effect, and the contestants must pay the costs of the proceeding.