"He (testator) never acknowledged or stated to either of them (witnesses) that the subscription which appears at the end of the paper was made by him. He did, it is true, declare that the whole instrument was his will. But that is not enough."

This was not necessary to the determination of the case, and, while this decision was affirmed in the Court of Appeals, it was without opinion. An affirmance without opinion does not necessarily mean approval of the opinion by the court below, but makes the Court of Appeals responsible only for the point decided (which in that case was that the will should not be admitted to probate). Rogers v. Decker, 131 N. Y. 490, 30 N. E. 571.

But if said Mitchell v. Mitchell be considered as holding that where a testator presents an instrument, previously written and subscribed by him, to the witnesses, with his subscription in plain sight, and declares the instrument to be his will, is not a sufficient acknowledgment of the subscription, then it (Mitchell v. Mitchell) is in direct conflict with Baskin v. Baskin, Matter of Laudy, Matter of Akers, Matter of Marley, Matter of Levengston, Matter of Nussbaum, and Matter of Holmberg, all of which are cited above.

I am satisfied that the will was executed as required by law, and a decree may be entered admitting same to probate.

---

### In re EICHLER et al.

(Surrogates' Court, New York County.   March, 1914.)

1. DIVORCE (§ 320*)—OPERATION AND EFFECT—RIGHT TO REMARRY.
    A decree of divorce following 2 Rev. St. (1st Ed.) pt. 2, c. 8, tit. 1, § 49, prohibiting the marriage of a defendant divorced for adultery, prior to the complainant's death, prevented the remarriage of the same parties before the enactment in 1880 of Code Civ. Proc. § 1761 (Domestic Relations Law [Consol. Laws, c. 14] § 8), authorizing the remarriage of such parties, which indicated that the Legislature regarded such marriages as forbidden.

    [Ed. Note.—For other cases, see Divorce, Cent. Dig. §§ 818, 819, 844; Dec. Dig. § 320.*]

2. MARRIAGE (§ 40*)—PRESUMPTIONS—COHABITATION.
    Cohabitation between persons divorced and without right to remarry is presumed to be illicit, and, being illicit in its inception, will be presumed to so continue unless a remarriage be shown by direct proof, or by circumstantial evidence which is strong, positive, and convincing.

    [Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 58–69, 79; Dec. Dig. § 40.*]

3. MARRIAGE (§ 50*)—COHABITATION OR REPUTATION—SUFFICIENCY OF EVIDENCE.
    Mere circumstances of cohabitation or common reputation of marriage, etc., do not constitute a valid marriage, but are only evidence of a marriage contract.

    [Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 79–89; Dec. Dig. § 50.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**4. MARRIAGE (§ 50*)—COHABITATION—SUFFICIENCY OF EVIDENCE.**

Where a woman divorced for adultery cohabited with her former husband while their marriage was prohibited, the continuance thereof after the removal of the prohibition was not sufficient to show a remarriage, though they held themselves out as husband and wife, and executed conveyances as such, especially in view of her subsequent marriage to one who boarded with them.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 79–89; Dec. Dig. § 50.*]

**5. MARRIAGE (§ 50*)—SUFFICIENCY OF EVIDENCE—CHARACTER OF PARTIES.**

In determining the existence of a marriage between persons cohabiting together, the character of the parties is of much importance; stronger evidence being required to establish a marriage circumstantially where the woman is of a loose and immoral character.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 79–89; Dec. Dig. § 50.*]

**6. MARRIAGE (§ 50*)—SUFFICIENCY OF CIRCUMSTANTIAL EVIDENCE.**

In establishing a marriage by circumstantial evidence, all the circumstances should be considered, and the decision should follow the line of the greatest probability.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 79–89; Dec. Dig. § 50.*]

**7. CRIMINAL LAW (§ 325*)—EVIDENCE—CONFLICTING PRESUMPTIONS.**

Where there are conflicting presumptions, one of which will impute a felony, and the other a crime of lesser degree, the presumption for the lesser offense will be followed.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 729; Dec. Dig. § 325.*]

**8. MARRIAGE (§ 40*)—EVIDENCE—CONFLICTING PRESUMPTIONS.**

While in order to legitimatize issue, or in the interest of order and decency, a marriage will, in a proper case, be presumed from cohabitation and reputation alone, where one party has married another, and would stand convicted of bigamy if a marriage were presumed, the presumption of innocence will prevail over the presumption of marriage.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 58–69, 79; Dec. Dig. § 40.*]

**9. MARRIAGE (§ 3*)—WHAT LAW GOVERNS.**

The marriage in New Jersey of one prohibited from marrying in New York, because of having been divorced for adultery, will be recognized by the courts of New York; a marriage, valid where performed, being valid everywhere.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 3, 23; Dec. Dig. § 3.*]

Judicial settlement of the account of Auguste Eichler and Paul C. Schnitzler, as administrators of Clara Koschinsky, also known as Clara Koshinsky or Keutel, née Clara Weber, deceased. Law governing distribution of estate determined.

Paul C. Schnitzler and Harold W. Hastings, both of New York City, for sisters of decedent.

Carl L. Schurz, of New York City (W. B. Devoe, of New York City, of counsel), for Clara Schwarz, née Koschinsky.

FOWLER, S. This matter, for the distribution of the estate of Clara Koshinsky, or Keutel, comes before the surrogate upon the ju-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes·

dicial settlement of the account of her administrators. It is submitted for decision upon an agreed statement of facts. It appears that Clara Weber was married in the city of Berlin, Germany, in the year 1868 to one Julius Keutel. Thereafter she and her husband came to this country, and they resided in the city of New York until the year 1873, when Julius Keutel obtained an absolute divorce from the deceased by decree of the Supreme Court of this state, made at the regular sessions held in and for the county of New York, by reason of the adultery of the now deceased woman. The judgment is dated June 27, 1873. Subsequently, and about the year 1874, the deceased and Julius Keutel, her former husband, as it appears, again lived together, in the same house in the city of New York, and were known as husband and wife, going under the name of Keutel continuously for a period of 18 years or thereabouts. It is conceded that during this period of 18 years in which they so lived together and cohabited in this city, they held themselves out as husband and wife. On December 3, 1893, the deceased, notwithstanding such intercourse, contracted a ceremonial marriage in Jersey City, New Jersey, with one Franz Koshinsky, who was at that time boarding with the deceased and the said Julius Keutel, as he had for a number of years prior thereto. At the time of this last ceremonial marriage of Clara Koschinsky or Keutel said Julius Keutel was still living, and no second judgment of divorce from him was obtained. Subsequently the deceased and the said Franz Koshinsky left this country and went to Germany, becoming residents of the city of Berlin, where they continued to reside as husband and wife until the death of said Clara, intestate, in Berlin, on December 16, 1910. The said Julius Keutel died in New York county on or about February 12, 1909, and Franz Koschinsky died in the city of Berlin, Germany, on January 12, 1912, intestate. The deceased woman left her surviving as next of kin three sisters, Augusta Eichler, Louise Westphal, and Marie Zschau.

[1] The sole question involved in this proceeding, the determination of which will control the method of distribution of the estate, presents for our consideration the validity of the alleged common-law or unceremonial marriage which it is claimed took place between the deceased, Clara Koshinsky, and Julius Keutel after their said divorce and the dissolution of their ceremonial marriage, such alleged unceremonial marriage being claimed to have taken place in the year 1874. The decree of divorce contained the usual provision, in effect, that Julius Keutel, the plaintiff in the action for divorce, was at liberty and had full power to marry again during the lifetime of Clara Keutel, the defendant, but that:

"The said defendant, Clara Keutel, shall not be and she is not at liberty to marry again until the plaintiff, Julius Keutel, shall be and is actually dead."

At the time of the inception of the alleged common-law marriage, the statute in force regarding the remarriage of divorced persons was section 49, pt. 2, c. 8, tit. 1, art. 3, Revised Statutes, which provided that:

"Whenever a marriage shall be dissolved, pursuant to the provisions of this article, the complainant may marry again during the lifetime of the defend-

ant, but no defendant convicted of adultery shall marry again until the death of the complainant."

It has never been directly decided by the courts of this state, except in one case in a court of first instance, whether or not the statute, or the prohibition contained in a decree of divorce pursuant to the statute, against remarrying applied only to marriages with a person other than the complainant, and did not prevent the remarriage of the parties to the action. Whether the innocent party who has the right to marry again may, under the circumstances, again enter into a new marriage relation with the same party against whom the divorce was obtained, and who by the decree was prohibited from marrying again, and such remarriage be legal and valid in this state, is the question now before me.

In Colvin v. Colvin, 2 Paige, 385, 22 Am. Dec. 644, where an application was made by a husband to vacate a decree of divorce obtained by him on the ground that he did not believe his wife to have been guilty of the adultery charged, the chancellor said, by way of dictum (which, of course, cannot be controlling authority, the question not being directly before the chancellor), that as long as the decree of divorce remained in force, the party prohibited from marrying again cannot marry even her former husband, and the chancellor said that if they cohabited without first applying to the court to have the decree of divorce vacated, the intercourse between them would be illicit and their issue illegitimate.

In Moore v. Moore, 8 Abb. N. C. 171, the court followed the dictum in Colvin v. Colvin, supra, and held that no exception was created by the statute in favor of the remarriage of the parties to the action. I say it with deference that I am of the opinion that this construction so placed upon the statute may be the correct one, as thought the Legislature, for in 1880, section 1761, C. C. P., was enacted, removing any statutory bar to the remarriage between the prior parties to a divorce. The amendment provided as follows:

"This section does not prevent the remarriage of the parties to the action."

Section 1761, C. C. P., is now embodied in section 8 of the Domestic Relations Law. It is apparent that this amendment assumed that the section of the Revised Statutes prohibited a remarriage between divorced persons, for the amendment must be assumed to have been enacted in contemplation of the terms of the original statute.

[2, 3] Thus it is that until the year 1880, when section 1761, C. C. P., was adopted (now section 8, Domestic Relations Law), permitting the remarriage of the parties to a divorce action, Clara Koshinsky and Julius Keutel could not have remarried in this state without first procuring the vacatur of the decree of divorce and the prohibition contained therein against remarriage. This they did not do. Being legally unable to remarry, their relationship and cohabitation, commencing in about the year 1874, is to be presumed illicit in its inception. A cohabitation, meretricious in its inception or origin, is presumed to continue such throughout its whole extent. (Clayton

146 N.Y.S.—54

v. Wardell, 4 N. Y. 230; Gall v. Gall, 114 N. Y. 109, 21 N. E. 106; Hynes v. McDermott, 91 N. Y. 451, 43 Am. Rep. 677), unless a change in the character of the relationship at some time during the cohabitation is affirmatively shown by direct proof or circumstantial evidence of the highest quality. When the evidence is circumstantial it must be very strong, positive, and convincing in order to establish that the meretricious relation has been changed by mutual consent to one lawful and matrimonial. Foster v. Hawley, 8 Hun, 68; Gall v. Gall, supra. Mere circumstances of cohabitation or common reputation of remarriage, etc., do not of themselves constitute a valid marriage; they are but presumptive evidence of a marriage contract. Clayton v. Wardell, 4 N. Y. 235; Hynes v. McDermott, supra.

[4-6] But it is argued that, even if the parties were prohibited from marrying prior to 1880, their living together after that year for upwards of 12 years raises a presumption of their remarriage after 1880, for in 1880, as already indicated, the ban against such remarriage had been removed by an amendment to the statute. Unfortunately for this contention, in Clayton v. Wardell, supra, the Court of Appeals has said that when the intercourse between parties was in its commencement meretricious, there is as much reason to presume that their subsequent connection continues of the same character, as there is to presume that a marriage had in fact taken place.

There is no fact submitted in the agreed statement of facts tending to show that there was ever any change of the illicit relationship denoted, and I would not be justified in assuming that a remarriage had taken place from mere cohabitation. A state of concubinage existing for a long period between two persons cannot be converted into a state of lawful matrimony without some evidence, circumstantial or otherwise, establishing an actual marriage between them. In cases of this kind the character of the parties to the alleged marriage is of much importance. Chamberlain v. Chamberlain, 71 N. Y. 423; Matter of Brush, 25 App. Div. 610, 49 N. Y. Supp. 803. It requires stronger evidence to establish a marriage circumstantially when the woman is shown to be of a loose and immoral character than it does in a case where the female is shown to be chaste, virtuous, and moral. The decedent was divorced on account of her adultery, and this is a matter of record in the Supreme Court. It is not harsh, therefore, to infer that she would be willing to cohabit again without the sanction of matrimony. I am of the opinion that no change of the illicit relationship is to be inferred in or after 1880. There is no evidence of a contract of marriage from or after that date. It is quite true that the decedent and Julius Keutel executed several conveyances and mortgages of real estate in which they styled themselves husband and wife. This, as is argued, is of considerable weight, but certainly it is not of great weight in this case. In establishing the validity of such a marriage as this, now claimed to be shown wholly by circumstantial evidence, *all* the circumstances ought to be considered by the court, and the decision should follow the line of the greatest probability. This is a rule of inference as well as of law. In the case of Clayton

v. Wardell, supra, it appeared that the parties had executed articles of separation in which they described themselves as husband and wife. Nevertheless, it was there held that this was insufficient to justify the inference of their marriage, because of other circumstances shown which detracted from that inference and overrode it.

[7, 8] Any mere presumption of the validity of a common-law marriage in this case after 1880 is affected by the fact that the decedent herself contracted a ceremonial marriage in New Jersey in 1893 with said Franz Koshinsky, who was a boarder in the home of Julius Keutel and Clara Koshinsky for several years previous to such marriage of Koshinsky with the decedent. Certainly Koshinsky must have had a somewhat intimate knowledge of the relationship existing between Mr. and Mrs. Keutel after their divorce. If one boarding in the home of the decedent for several years did not believe her to be a married woman, it cannot be said that her reputation as a woman then married to Keutel was general. If she was in fact in 1893 married to Julius Keutel, she committed a felony by marrying Koshinsky in 1893, and thus we have here a conflict of presumptions, or the presumption of the validity of the common-law marriage as against a presumption of innocence. As was said by the jurist Alciatus, "Alia præsumptio aliam tollit." So in our law where there are conflicting presumptions and one will impute a felony and the other will impute a crime of lesser degree, the common law will presume for the lesser offense. R. v. Twyning, 2 B. & A. 386; and see cases cited, section 101, Jones on Ev. This is but a qualification of common justice.

It is quite true that in order to legitimatize issue, or in the interest of order and decency, the court will, in a proper case, presume marriage from cohabitation and reputation alone, but in a case where to presume such marriage one party will necessarily stand convicted of bigamy, the presumption of innocence prevails over the presumption of marriage. Foster v. Hawley, 8 Hun, 68, and cases cited; Jones, Ev., § 101.

I am convinced, irrespective of presumptions, that the decedent's conduct and declarations rebut the idea that any marriage existed between Keutel and herself after their divorce. The decedent went out of this state to New Jersey to contract the ceremonial marriage with Koshinsky, and in the certificate of marriage, a copy of which is before me, she stated that she had been divorced, and that this was her second marriage. If she then believed she had been validly remarried to Keutel, she is chargeable with the knowledge that she could no more validly marry another man in the state of New Jersey than elsewhere. In the Matter of Smith, 74 Misc. Rep. 11, 133 N. Y. Supp. 730, the court said:

"A man and a woman may deceive their relatives, friends, and neighbors and the public generally into the belief that they are husband and wife, * * * and the force of declarations and conduct from which a marriage might be inferred is entirely destroyed by proof that the man and woman, in the privacy of their own hearts, did not consider that a marriage had been had."

[9] In view of all the facts and circumstances disclosed I am of the opinion that there was no valid marriage existing between Julius Keutel and the decedent after the entering of the judgment of their divorce in 1873. While the decedent was forbidden to marry again in this state, she could contract a marriage in New Jersey, which, if valid there, would be recognized by the courts of this state. Van Voorhis v. Brintnall, 86 N. Y. 18, 40 Am. Rep. 505; Thorp v. Thorp, 90 N. Y. 602, 43 Am. Rep. 189. Marriage valid under the laws of the state where it is performed is valid everywhere. I take it that there is no question concerning the validity of the New Jersey marriage to Koshinsky, provided the deceased woman was then not remarried to Keutel, and I hold that she was not.

The distribution of the estate should be made accordingly.