(86 Misc. Rep. 110)

### MOLLER v. SOMMER.

(Supreme Court, Special Term, New York County. June, 1914.)

1. MARRIAGE (§ 60*)—ACTION TO ANNUL—SUFFICIENCY OF EVIDENCE.
Evidence, in an action to annul a marriage, *held* to show that plaintiff was not induced by fraud or deception to enter into the marriage relation.
[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 125–128, 130–135; Dec. Dig. § 60.*]

2. MARRIAGE (§ 50*)—COMMON-LAW MARRIAGE—SUFFICIENCY OF EVIDENCE.
Evidence, in an action to annul a marriage, and to compel the return to plaintiff of property obtained by defendant through deeds and separation agreements, *held* insufficient to show that a common-law marriage existed between defendant and another when she married plaintiff.
[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 79–89; Dec. Dig. § 50.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. MARRIAGE (§ 20*)—"COMMON-LAW MARRIAGE."
   A "common-law marriage" is a status which can be assumed by a man and woman competent to contract, by a simple agreement between them, without ceremony and without witnesses.
   [Ed. Note.—For other cases. see Marriage, Cent. Dig. §§ 12–14; Dec. Dig. § 20.*
   For other definitions, see Words and Phrases, vol. 2, p. 1332.]

4. MARRIAGE (§ 20*)—COMMON-LAW MARRIAGE—INTENTION OF PARTIES.
   It is essential, to the existence of a common-law marriage resulting from contract, that the minds of the parties shall have met on an agreement to create such a relationship.
   [Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 12–14; Dec. Dig. § 20.*]

5. MARRIAGE (§ 40*)—EXISTENCE—PRESUMPTION.
   Intercourse, illicit in its inception, presumably continues to be so unless the presumption is repelled by a contrary presumption of marriage.
   [Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 58–69, 79; Dec. Dig. § 40.*]

6. MARRIAGE (§ 50*)—EXISTENCE—PRESUMPTION.
   Where two alleged marriages compete and one is proved as a fact, whether by direct or circumstantial evidence, the other cannot stand on the mere presumption founded on cohabitation and repute.
   [Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 79–89; Dec. Dig. § 50.*]

Action by Charles G. Moller against Jane Sommer, known as Jane Moller, to annul a marriage and compel return of property. Judgment for defendant.

Cabell & Gilpin, of New York City, for plaintiff.

Albert B. Boardman and John F. Cowan, both of New York City, for defendant.

COHALAN, J. [1] Action (1) to annul a marriage and (2) to compel the defendant to return to the plaintiff herein certain property obtained by her through deeds and separation agreements. The complaint alleges that, at the time the plaintiff and the defendant intermarried, the defendant had a lawful husband living; that she had entered into a common-law marriage agreement in 1904, in the state of Missouri, with one Symbert Sommer, from whom no divorce had been secured. It is alleged that the property in question should be restored to the plaintiff for these reasons: That it was obtained from him by the defendant (a) through fraud and undue influence; (b) through the mental incompetency of the plaintiff; and (c) through his ignorance of the law of the state of Missouri and of the fact that under the law the defendant had become the wife of Symbert Sommer. There is no dispute as to the facts in the case. The plaintiff and the defendant were married in the city hall on the 26th day of August, 1910. At that time he was a widower, 65 years of age, and was possessed of property to the value of nearly $1,000,000. The defendant was a widow of no means, 47 years of age, and had been living for several years as the mistress of Symbert Sommer. Prior to the marriage the plaintiff and the defendant had entered into meretricious relations, and shortly thereafter,

and during a serious illness, the plaintiff not only transferred valuable real and personal property to the defendant, but he made a will entirely in her favor. It is to the defendant's credit—if such a term can be applied in any sense to her course of conduct in this case—that she fully informed the plaintiff of the character of life that she was leading with Sommer; that she told him she had lived during a period of time with Sommer in St. Louis, as well as for several years in the plaintiff's own house in this city. It must be assumed, therefore, that the plaintiff was fully informed of the type of woman that he had settled upon as his wife, and what her antecedents were with respect to her eligibility to assume the married state. This is especially true when his mental condition is considered. At that time, so far as the evidence shows, he was mentally competent, and while I am convinced from the testimony of Dr. McPhee that the plaintiff was in no condition to make proper disposition of his property, in October, 1910, his appearance as a witness on the trial of this case showed him to be a man possessed of apparently unimpaired faculties. It may also be said in the plaintiff's favor that he frankly admitted that he had even respect and affection for the defendant. These circumstances at the very outset indicate that, so far as the marriage was concerned, there was no fraud or deception practiced upon the plaintiff. In brief, the plaintiff's own testimony is proof sufficient that he was neither coerced nor driven to assume the relationship.

[2] It is important to examine the defendant's relations with Sommer, so as to ascertain whether or not they ever were actually married. It is conceded that there never was solemnized between them a ceremonial marriage, and as their relations began subsequently to the passage of the Domestic Relations Act (Consol. Laws, c. 14) in this state, in 1901, a common-law marriage cannot be predicated of their relations in this state. Both Sommer and the defendant admit that their intimacy began in New York, and that it was resumed during the St. Louis Exposition in the state of Missouri. However, both unequivocally declare that there never was a present or a future agreement to marry. The defendant asserts that she was unable to get the assent of Sommer to such a contract, and Sommer maintains that he never had any intention to enter into a matrimonial agreement.

[3] The elements necessary to constitute a common-law marriage in the state of Missouri are precisely the same as they were in this state prior to 1901. Topper v. Perry, 197 Mo. 531, 95 S. W. 203, 114 Am. St. Rep. 777; Cargile v. Wood, 63 Mo. 501. The rule is that such a marriage is a status, which can be assumed by a man and woman competent to contract by a simple agreement between them, without ceremony and without witnesses.

[4] It is required that such an agreement must be proved by the party asserting its existence in the same way that other contracts are proved. In a word, before the court can find that a man and woman have become husband and wife as the result of a contract, it must ascertain by competent testimony whether or not the minds of the parties met upon an agreement to create such a relationship. An examination of the evidence adduced does not convince me that the minds of the parties

ever met on the question of marriage. To so hold would be to disregard the direct testimony of the involved parties. They assert that, while they were sojourning in St. Louis, they never took out a license to marry; that they never went before any justice of the peace, clergyman, or other person to get married; that they never wrote any letter or signed any paper of any nature or description in which there was a statement that they had become husband and wife. It is true that they talked about marriage; she urged it, and he opposed it. The testimony of the witness Schell as to a marriage certificate is at least vague. Her statement that a paper was shown to her that she thought was a marriage certificate is a circumstance of no value in the light of the express denials of such an occurrence by the defendant. The plaintiff urges that there was a marriage agreement because of the fact that the defendant entertained a certain religious belief. This assertion lacks force. If she were a devoted member of any church, she would have insisted upon a ceremonial marriage, and, furthermore, this contention is negatived by the fact that the defendant was willing to, and did, assume illicit relations with the plaintiff as well as she formerly did with Sommer.

[5] Moreover, the rule is that where the intercourse is illicit in its inception, as in this case, it continues to be of that character, unless repelled by a contrary presumption of marriage. Badger v. Badger, 88 N. Y. 546, 42 Am. Rep. 263; Caujolle v. Ferrie, 23 N. Y. 90.

[6] As the defendant changed her mode of life and subsequently married the plaintiff, the presumption that she did not commit bigamy, it would seem, would counteract any presumption from the evidence of cohabitation, recognition, and reputation. In Matter of Eichler, 84 Misc. Rep. 667, 146 N. Y. Supp. 846, the court said:

"It is quite true that, in order to legitimatize issue or in the interest of order and decency, the court will in a proper case presume marriage from cohabitation and reputation alone, but in a case where, to presume such marriage, one party will necessarily stand convicted of bigamy, the presumption of innocence prevails over the presumption of marriage."

It cannot be doubted that, in the absence of a marriage agreement, the parties had the legal right to regard their relations as illicit, and that they might terminate them whenever their choice so dictated. They made an election to terminate their relations, and thereafter the defendant entered into lawful wedlock with the plaintiff. The doctrine enunciated in many authorities is that where two alleged marriages compete, and one of them is proved as a fact, whether by direct or circumstantial evidence, the other cannot be left to stand upon the mere presumption founded on cohabitation and repute. Chamberlain v. Chamberlain, 71 N. Y. 423; Foster v. Hawley, 8 Hun, 68, Hynes v. McDermott, 91 N. Y. 451, 43 Am. Rep. 677. It is my view that no common-law marriage was ever consummated by the defendant and Sommer. The marriage in this case has been an unhappy one. There have been several separations as well as frequent reconciliations between the plaintiff and the defendant. There were entered into three separation agreements, all calculated for substantial consideration, to restore to the plaintiff the property that the defendant had secured from him,

and to release her dower right in his real property. The final agreement of the 28th day of May, 1912—made necessary by the fact that the parties had lived together subsequently to the execution of the contract of the 17th day of October, 1911—was confirmatory of the provisions of the two prior agreements, wherein it was provided that the defendant should turn over to the plaintiff the premises No. 290 Madison avenue, and should relinquish her dower right in his estate, in return for which he was to transfer to her cash and securities to the value of $75,000. It is the plaintiff's contention that all these transfers and these settlement agreements were based solely upon the belief on the part of the plaintiff that the defendant was his legal wife. Hence, upon his supposed discovery for the first time after their final separation that the defendant was not his wife, these transfers and agreements were voidable at his option. This position on his part eliminates the question of fraud and undue influence. In other words, he asserts that this is not a voidable marriage, but a void marriage. It is attacked, therefore, upon the theory that, having been void ab initio, it is not capable of being ratified. Stokes v. Stokes, 198 N. Y. 301, 91 N. E. 793. I hold that the marriage between the plaintiff and the defendant was valid, and that the separation agreements, culminating in the agreement of the 28th day of May, 1912, are valid and subsisting contracts. Decision and judgment in accordance with this opinion may be settled on notice.

Judgment accordingly.