In the Matter of the Final Judicial Settlement of the
Account of Proceedings of Anna Seymour as Ad-
ministratrix of the Goods, Chattels and Credits of
John J. Seymour, Deceased.

(Surrogate's Court, Westchester County, November, 1920.)

Executors and administrators — accounting — when common-law
marriage establishes status of widow.

Where in January, 1903, when common-law marriages were
invalid in the state of New York, citizens thereof legally
entered into a common-law marriage in the state of Pennsyl-
vania, whither they had gone for that express purpose, and
immediately returned to the state of New York, such marriage
is not invalid here.   (P. 433.)

Where irrespective both of what happened in the sister
state and that common-law marriages were not valid in the
state of New York between January 1, 1902, and January 1,
1908, it appears that for the years prior to the latter date
the acts and conduct of the parties were such as to give evi-
dence of a purpose to live together as husband and wife, a
contract of marriage will be presumed to have been entered
into on that date.   (Pp. 433, 434.)

Upon the settlement of the accounts of the administratrix
of decedent his next of kin challenged the widowhood of
the petitioner.   *Held,* that the evidence clearly established a
common-law marriage between petitioner and decedent in this
state and her *status* as his widow, and a decree will be entered
directing distribution of the estate accordingly.

The essential elements of a valid common-law marriage
stated and discussed.

Proceeding upon the judicial settlement of the ac-
counts of an administratrix.

Eugene F. McKinley, for administratrix.

Strang & Taylor, for William Seymour et al., next
of kin.

Surrogate's Court, Westchester County, November, 1920.　[Vol. 113.

Slater, S. Upon this accounting, the collateral issue of marriage is raised. The next of kin of the decedent challenge the widowhood of the petitioner. The petitioner is required to establish her *status* in this court. *Matter of Hamilton,* 76 Hun, 200. The decedent died on October 1, 1918. Letters of administration issued to said Anna Seymour, the widow, upon her petition. Effort has been heretofore made to vacate her letters of administration. 107 Misc. Rep. 330. Another phase of the litigation affecting this estate will be found in 112 Misc. Rep. 216.

No direct evidence of a ceremonial marriage, or compliance with chapter 339 of the Laws of 1901, requiring non-ceremonial marriages to be evidenced by a written agreement, is disclosed by the record. Evidence by the widow, of a ceremonial marriage in Philadelphia, Penn., on January 18, 1903, was given, but later excluded by the court by reason of section 829 of the Code of Civil Procedure. Her evidence was stricken out and has not been considered in formulating this opinion. *Matter of Brush,* 25 App. Div. 610; *Matter of Hinman,* 147 id. 452; affd., 206 N. Y. 653; *Fisk* v. *Holding,* 163 App. Div. 85; *Griswold* v. *Hart,* 205 N. Y. 384. The evidence of the widow, even if competent, is not necessary to a decision of the case in her favor. If her evidence had been admitted, and not considered as necessary, it would not have been error to admit it, when it should not have been admitted. Code Civ. Pro. § 2757; *Matter of Weed,* 143 App. Div. 822; *Wilson* v. *Kane,* 180 id. 77; *Matter of Adler* v. *Levene,* 191 id. 40.

Communities attach the deepest significance to customary and religious sanctions applied to sexual relation. The canonical rules relating to marriage have been modified by modern civil legislation. In the older civil law, an informal union was treated as marriage.

This kind of a marriage was founded upon consent — agreement — contract, and was accompanied by the taking of the wife to the husband's house. This form-less marriage in these latter days prevails in many states of the Union, and at this writing prevails by legal enactment and decision in this state.

To constitute a valid common-law marriage, at least two essentials must appear: (1) Mutual consent and capacity of the parties. (2) The agreement itself must be to become husband and wife *per verba de praesenti.* Common-law marriage may be without the interposi-tion of witnesses, or of any person authorized to solemnize marriage. Circumstances are valuable in establishing a marriage only so far as they tend to show consent. Cohabitation and repute among friends and neighbors are proper evidence of consent. The agreement, or consent, may be oral, or in writing, and may be proven like any other contract. If the parties enter into a mutual contract to assume the relations of husband and wife, then they are married in fact. *Meister* v. *Moore,* 96 U. S. 76; *Travers* v. *Reinhardt,* 205 id. 423. To insure the protection of the parties and their children, and upon consideration of sound public policy, some public recognition of the marriage is necessary as evidence of its existence. If the par-ties who had exchanged the promise cohabitated, its effect was to establish a presumption of present con-sent. Add to this, general repute and acknowledg-ment over a period of years, the law will presume a contract and create a valid common-law marriage.

Let us apply the principles herein set forth to the proven facts of this case. If any marriage has been proven, it must be a common-law marriage. Between January 1, 1902, and January 1, 1908, a common-law marriage was not valid in this state. Section 19, chap-ter 339, Laws of 1901, states the public policy in these

words: " No marriage claimed to have been contracted on or after the first day of January, nineteen hundred and two, *within this state,* otherwise than in this article provided, shall be valid for any purpose whatever, * * *."

Credible witnesses acquainted with the decedent for a lifetime testify the decedent and the administratrix were well known residents of the town of Somers, Westchester county; that the decedent was born and lived there all his early life. It appears that they had both contracted prior marriages and that their spouses had died. Neighbors testified that about January 19, 1903, John J. Seymour and Anna Seymour appeared at Somers, and the decedent stated to them that he was married to the petitioner, and introduced the petitioner as his wife to these lifelong friends, also his neighbors. Both occupied the house upon the farm of the decedent for a period of about three years and were visited by the witnesses who had meals with them and enjoyed their hospitality. Here they lived the life of the average farmer in the country. These witnesses who reside at the hamlet of Granite Springs, in Somers, Westchester county, testify that in the month of January, 1903, they received through the mail printed or engraved announcements of the marriage of the decedent and the petitioner. Such an announcement, or letter was offered and received in evidence. It stated as follows:

" John J. Seymour and Anna Cerel Andrews Married, Sunday, January eighteenth, Nineteen hundred and three, Philadelphia, Pa."

Judicial notice is taken of the fact that January 18, 1903, did fall upon Sunday. The law presumes that a letter properly directed and stamped, sent by post, will be properly transmitted and be received by the person to whom it is directed. *Oregon S. S. Co.* v. *Otis,*

100 N. Y. 446, 451; *Diehl* v. *Becker*, 227 id. 318. The presumption may be said to be even stronger — in the case where a letter is transmitted and received through the mail, that it was sent by the person or persons referred to in the letter as the sender. Such a marriage announcement is the joint act of both persons. *Badger* v. *Badger*, 88 N. Y. 546.

In 1906, when the farm, located in the town of Somers, and upon which they lived, was sold by the decedent, Anna Seymour, the petitioner, was recited and joined in the deed as his wife. The deed read " John H. Seymour and Anna Seymour, his wife, as grantors." The original deed was offered in evidence. It was duly acknowledged before a proper official. His signature was established. This was the recorded act of John J. Seymour. It was a solemn acknowledgment by the said Seymour, made to the world, that this woman was his wife. It was not in conflict with the life they lived at the farm house. Several other witnesses testify that the decedent introduced to them the petitioner as his wife, and held her out to the world as such, prior to 1908, likewise after January 1, 1908. Many of the witnesses were visitors at the farm house at Granite Springs. Often the decedent and the petitioner visited certain witnesses who resided in New York city, dined with them, spent the evening together, and afterward departed for their home. In April, 1908, the decedent and the petitioner removed to Kingston, N. Y., where he purchased real property, and there they resided until March, 1911. Credible witnesses from that city testify that they became acquainted with them, visited at their home, and had meals there; that decedent introduced the petitioner to them as his wife, and held her out to the public as such. When this real property was sold the petitioner was again recited, and joined in the deed, as the wife

Surrogate's Court, Westchester County, November, 1920.    [Vol. 113.

of the decedent.  The original deed of this transaction
was exhibited in evidence.  This was the recorded act
of the decedent.  It was again his acknowledgment of
the wifehood of the petitioner which cannot be effaced
from the record.  While dead, yet he speaks.  Admis-
sions as to the facts of one's own marriage are en-
titled to great weight.  In the spring of 1911, the peti-
tioner established her home in New York city.  Here
she supported herself in the practice of her profession
as a nurse.  Witnesses testify that at this period the
decedent lived in Westchester county, but called at
her home from time to time; was seen going in and
coming out, and within the apartment many different
times.  Decedent acknowledged the petitioner at this
date as his wife to these several witnesses.  It appears
and was testified to by old friends and neighbors in
Somers, then living in New York city, that they visited
the decedent and petitioner in that city, and that these
visits were returned.  During the years 1915, 1916, and
1917, the decedent was in communication with the peti-
tioner by letter, each enclosed in envelopes, and all
addressed to Mrs. Anna Seymour, at her New York
city number, wherein he called her " Dear Anna " and
signed " John."  These letters told and retold of his
physical infirmities of the most private nature and
their treatment by physicians.  They can bear the in-
terpretation of innocence and of an affectionate dis-
position existing between them.  To prove the general
reputation that a woman is married, addresses of let-
ters written to her are admissible in evidence.  *Cuneo*
v. *DeCuneo,* 24 Tex. Civ. App. 436.  The letters were
not written and sent by friends, however, but by John
J. Seymour himself.

The testator was then a sick man and about the
spring of 1917 he entered a hospital in New York city
for medical treatment.  Upon leaving the hospital, he

immediately went to the apartment of the petitioner, and remained there for several days. One witness testified that she called upon the petitioner there, and saw John J. Seymour, and that she had known him for twenty years. The apartment consisted of a living room, a kitchenette, and one bedroom, containing a bed. Here John J. Seymour remained until it was decided that he seek convalescence in the country. He died in the fall of 1918.

Any mutual agreement between a man and woman to be husband and wife *in praesenti,* followed by cohabitation, constitutes a valid and binding marriage. An actual marriage may be presumed from matrimonial cohabitation and acknowledgments of the parties. A mere formal contract is not the essential thing. Marriage is a *status* which may be established by the words, actions, and the lives of the parties evidencing their understanding and intent.

The general definition of matrimonial cohabitation is the living together of man and woman ostensibly as husband and wife. *Pollock* v. *Pollock,* 71 N. Y. 137. Even where there is matrimonial disability, the subsequent marriage after the removal of the disability may be presumed from act and recognition by the parties of each other, said Chancellor Walworth in *Rose* v. *Clark,* 8 Paige, 574.

If a man says this woman is my wife, I acknowledge her as such; cohabits with her and holds her out to the world as his wife, it creates a purely civil contract. It requires nothing more than a simple consent of the parties and that consent can be shown by mere words of present contract, by declarations and acts, or by the continued course or habit of living. The single question in all these cases is this: Was there a contract between the parties to live together as man and wife? The law does not require to know when

and where the agreement was made. No witnesses are requisite, nor need the time and place be pointed out. Curiosity may be gratified; but justice is satisfied by having the existence of the contract determined, says the court in *Tummalty* v. *Tummalty,* 3 Bradf. 369; followed by *Matter of Taylor,* 9 Paige, 611; *Grotgen* v. *Grotgen,* 3 Bradf. 373; *Wilcox* v. *Wilcox,* 46 Hun, 32; *Gall* v. *Gall,* 114 N. Y. 109; *Matter of Schmidt,* 42 Misc. Rep. 463; *Matter of Hinman, supra; Matter of Eichler,* 84 Misc. Rep. 667; *Matter of Reinhardt,* 95 id. 413; *Matter of Spondre,* 98 id. 524; 26 Cyc. 872.

Judge Rumsey in *Matter of Brush,* 25 App. Div. 610, said: " That agreement, if it is not proven in express terms by competent evidence, may be established by the fact of cohabitation and reputation among their friends and neighbors, and of recognition of each other as holding that relation " (citing *Gall* v. *Gall, supra; Hynes* v. *McDermott,* 10 Daly, 423; affd., 91 N. Y. 451); but these facts of themselves do not constitute a marriage. They are simply evidence from which, if sufficiently strong, the courts are at liberty to infer that the cohabitation was the result of a previous agreement to become man and wife and from the fact to infer further that a marriage actually existed between the parties. *Davidson* v. *Ream,* 97 Misc. Rep. 89; affd., 178 App. Div. 362; *Wilson* v. *Burnett,* 105 Misc. Rep. 279.

I am satisfied that the many witnesses who thus testified before me spoke the truth. The admissions of the decedent found in the marriage announcement; in the two deeds of real property; in the addressed envelopes and letters; in his conversations with witnesses, are of great probative effect. They are strong evidence against the contention of the next of kin that the facts they state are not true. *Koester* v. *Rochester Candy Works,* 194 N. Y. 92.

Judge Collin, in *Gangi* v. *Fradus,* 227 N. Y. 452, 457, speaking of admissions, says: " In case they were made understandingly and deliberately, are of pure fact within the knowledge of the declarant, and were made under conditions and circumstances conducive to veracity, and are not overborne by the other facts in evidence, they may, in reason and sound judgment, establish a cause of action or a defense.''

The facts given in evidence and briefly narrated herein, raise a presumption that the petitioner and the decedent had entered into a marriage agreement. When was the date of this contract? Where was the place of the marriage agreement? The admissions by John J. Seymour in the words of the marriage announcement, followed by his several admissions of marital relations with the petitioner, made to the three witnesses, named Carpenter, directly after January 18, 1903, cause me to hold that a marriage contract was entered into between the decedent and the petitioner on January 18, 1903, at Philadelphia, Penn.

Under the law of the state of Pennsylvania, a marriage is a civil contract, and may be made *per verba de praesenti.  Richard* v. *Brehm,* 73 Penn. 140; *Maryland* v. *Baldwin,* 112 U. S. 490. Conformity with the law is always presumed; never the contrary.

It is a general rule of law that a contract entered into in another state, if valid according to the law of that place, is valid everywhere. Story Conflict of Law, § 242. Therefore, the rule recognizes as valid a marriage, considered valid in the place where celebrated. As marriage is something more than a mere contract, it establishes a *status* which is subject to the law of the domicile. There are exceptions to the rule above stated; cases first of incest or polygamy coming within the prohibition of natural law; second, of prohibition by express law.

Judge Hiscock, in *Cunningham* v. *Cunningham*, 206 N. Y. 341, at page 348, writing regarding the validity of marriage contracts made in other states, said: " It must be borne in mind that I have been discussing the question of the powers of the courts of our state to determine the status of our own citizens. I do not question the validity of marriage contracts made in other states conformatory to the laws of such state, or that they will be recognized as valid in this state, unless they are contrary to the prohibition of natural laws, or to *the express provisions of our statute.* We would not in this state recognize a contract of marriage in another state in several instances, such as between a father and a daughter, or where the consent was procured through force, duress, or fraud, etc. We do recognize the remarriage of a former husband or wife who has been divorced and has been forbidden to again marry, where such marriage took place in a state where it was authorized, but this is upon the ground that the forbidding to remarry was in the nature of a penalty which had no effect outside of this state." 26 Cyc. 829; *Van Voorhis* v. *Brintnall*, 86 N. Y. 18; *Thorp* v. *Thorp,* 90 id. 602; *Matter of Eichler,* 84 Misc. Rep. 667; *Travers* v. *Reinhardt,* 205 U. S. 423; *Minor* v. *Jones,* 2 Redf. 289; *Kinnier* v. *Kinnier,* 45 N. Y. 535.

Is a common-law marriage entered into in a sister state between January 1, 1902, and January 1, 1908, violative of an express provision of our statute? I think not.

It will be noted that section 19 of chapter 339 of the Laws of 1901 says: " No marriage claimed to have been contracted on or after the first day of January, nineteen hundred and two, *within this state,* otherwise than in this article provided, shall be vaild for any purpose."

Although every state can regulate the *status* of its own citizens, yet in the absence of express provisions a legislative intent cannot be inferred to contravene the *lex loci contractus*. Such an intent must be clearly expressed in the statute. The legislature undoubtedly has power to follow its citizens into another state. *Van Voorhis* v. *Brintnall*, 86 N. Y. 18.

There is no express provision in our statute making invalid marriages contracted in a foreign jurisdiction, when such marriages would be invalid if contracted in this state. The arm of the law has not yet been extended that far. Our law makes it unlawful for the adulterer to remarry in this state. If the law is violated in this state, the marriage is void. *Gardner* v. *Gardner*, 98 Misc. Rep. 411; *Roth* v. *Roth*, 97 id. 136.

Such acts are contrary to the express provision of our statute, because they are marriages contracted *within this state*.

In *Donohue* v. *Donohue*, 63 Misc. Rep. 111, the court said: " The operation and effect of our statute upon the subject of annulling marriages is confined to the State of New York and in the nature of the case, can have no effect upon the status of the parties at the time of their marriage in Canada. If the marriage had taken place in this State, the contract would have been voidable. In the Province of Ontario, Canada, it was not voidable; and the parties, as between themselves, must be held to have so understood it at the time. To hold, as contended by the plaintiff, that residents of the State of New York sojourning in another state or country, where marriage by them is permitted without restriction or conditions of any character, may marry there and forthwith return to this State and procure the marriage to be annulled, under our statute prescribing the age of legal consent, is abhorrent not only to a proper sense of justice, but also

to the well settled rule that a marriage, valid where it is entered into, is valid here.''

In *Earle* v. *Earle,* 141 App. Div. 611, the court said: '' The general rule is that the law of the matrimonial domicile of the parties governs in actions for divorce — the same rule by analogy applies to an action for the annullment of a marriage — regardless of where the marriage was solemnized or where the offense, which is the ground upon which the divorce is predicated was committed; *but in the absence of a statute of the State of the domicile of the parties expressly regulating marriages abroad,* which it seems it is competent for the legislature to enact as to persons domiciled within the State, the *lex loci contractus* governs as to the validity of the marriage unless the marriage be odious by common consent of nations, as where it is polygamous or incestuous by the laws of nature.''

In *Medway* v. *Needham,* 16 Mass. 157, effect was given in Massachusetts to a marriage celebrated in Connecticut by a couple, one of whom was black and the other white, who were domiciled in Massachusetts, the laws of which prohibited a marriage between them, and who went to Connecticut, where the laws did not prohibit such a marriage, for the express purpose of marrying and with the intention of returning, as they did. At that time, the laws of Massachusetts did not expressly prohibit such marriages in another state. Legislation to affect this condition was afterward had (Rev. Stat. of Mass. chap. 75, § 6; Gen. Stat. chap. 106, § 6) in these words: '' Where persons resident in this State, in order to evade the preceding provisions and with an intention of returning to reside in this State, go into another State or country and there have their marriage solemnized and afterwards return and reside here, the marriage shall be decreed void in this State.''

We had no express law to prevent our citizens from engaging in common-law marriages beyond our borders between January 1, 1902, and January 1, 1908. The legislature did not intend to reach beyond the state. The law which has been held to prohibit common-law marriages here speaks of marriages " within the state." It is not prohibitive of marriages valid in other states.

When, therefore, John J. Seymour and the petitioner returned to this state, previously married under the common law of Pennsylvania, they found that such a contract as they had entered into was not expressly prohibited by our statute.

No case in this state has been called to my attention containing facts similar to the instant case, and deciding the question, whether, between January 1, 1902, and January 1, 1908, when common-law marriages were invalid in this state, a marriage contracted under the common law in force in a foreign jurisdiction was invalid here, when undertaken by citizens of our state, who went into the sister state for the avowed purpose of contracting a common-law marriage, and immediately returning to this jurisdiction.

In my opinion, it is proper to hold that the decedent and the petitioner entered into a common-law marriage at Philadelphia, and were legally married under the laws of Pennsylvania. If, however, I am wrong in my view of the law that a valid common-law marriage was not entered into in Pennsylvania, and even if contracted there, was invalid here, there is ample evidence for holding that on January 1, 1908, a common-law marriage was indeed contracted by the parties within this State.

If we leave aside, however, what the parties did on January 18, 1903, at Philadelphia, Penn., looking to their common-law marriage in that state, yet what

28

they did in New York afterwards constituted a valid marriage at common law between them in this state.

Since January 1, 1908, common-law marriages are valid in this state. Laws of 1907, chap. 742; *Matter of Ziegler* v. *Cassidy's Sons,* 220 N. Y. 98.

Irrespective of what happened in Pennsylvania, and irrespective of the law now laid down by the courts that a common-law marriage could not take place in this state between January 1, 1902, and January 1, 1908, the evidence clearly shows that the parties were right in believing that they were man and wife on and after January 18, 1903. *Matter of Hinman, supra.* The non-ceremonial marriage in New York state did not begin in meretricious relations, which relations Mr. Surrogate Fowler has characterized " as abhorrent to the well regulated portions of the community." The parties themselves believed the marriage in Pennsylvania to be valid. In January, 1903, they declared themselves married to many witnesses who appeared in court, and ever after maintained the appearance of matrimony. The instant case differs from cases where parties come together simply for purposes of illicit intercourse. Where such relations are originally established, they are presumed to continue. The facts here, however, overcome such presumption, being entirely different from those disclosed in *Matter of Smith,* 74 Misc. Rep. 11, and *Spencer* v. *Spencer,* 84 id. 264, where marital ventures with other persons intervened, overcoming the presumption of a marriage contract. The principle controlling here is stated in *Matter of Biersack,* 96 Misc. Rep. 161, 170; affd. 179 App. Div. 916. The court said: " It is said that a connection illicit in its origin will be presumed to retain that character until some change is established, but it is made clear in many cases that a change which imposed upon such relations an honorable char-

acter may be shown without proof of an instant and determined act of the parties, and that the transformation may be derived from circumstances strongly indicating that the connection became matrimonial."

" It is sufficient if the acts and declarations of the parties, their reputation as married people, and the circumstances surrounding them in their daily lives, naturally lead to the conclusion that, although they began to live together as man and mistress, they finally agreed to live together as husband and wife." *Gall* v. *Gall,* 114 N. Y. 109, 118, and cases cited.

The language quoted was applied to persons who originally entered into sexual relations solely from the impulse of lust, but who thereafter gradually emerged from a sordid life into a condition openly indicative of matrimony.

After January 1, 1908, the same relations continued in the same manner; the conduct of the parties before the world, and toward each other, continued in the eyes of friends and relatives. The deed of the Kingston land was a publication by John J. Seymour of their marital condition. For the years prior to January 1, 1908, these acts gave evidence of a purpose to live the life of married man and woman. Mr. Surrogate Ketcham well states it in *Matter of Biersack, supra,* and what he says well applies to the instant case: " For the years before January 1, 1908, these two, by every act ordinarily appropriate to a marital contract, gave evidence of an abiding purpose, which was only defeated or suspended by the bar of the statute. During all of that time, it may be said that they were leaning against an obstruction to their sincere intention and agreement, and that when the law broke down the barrier they fell forward into the proper relation towards which they had constantly inclined." *Summo*

Surrogate's Court, Westchester County, November, 1920. [Vol. 113.

v. *Snare & Triest Co.,* 166 App. Div. 425; *Wilson* v. *Burnett, supra.*

After the impediment had been removed, the law will presume that the decedent and the petitioner consented and agreed to continue their relations as husband and wife. The evidence shows that they acted accordingly. At all times, they had acted in good faith. Duration of cohabitation must be taken in consideration. Immediately on January 1, 1908, a contract of marriage will be presumed to have been entered into. Their conduct established the contract. The presumption of marriage, when it once arises, is a strong one, there can be no doubt, but it is certainly rebuttable. *Caujolle* v. *Ferrie,* 23 N. Y. 90; *Hynes* v. *McDermott,* 91 id. 451. Not a scintilla of worth while evidence was offered upon the trial by those who questioned the widowhood of the petitioner, to rebut the presumption arising from the testimony of the witnesses brought into court by her. The next of kin make something out of the fact that, in the application for a license to marry, issued in New York city on January 9, 1919, to John Donaldson and Anna Seymour, it appears that, to the question " Number of marriages," the answer " second " is made. This is of little or no moment. It is offset by the fact that the application is made and sworn to by "Anna Cerel Seymour," and by that name she was married. It cannot be well said that this answer is a denial of her marriage with the decedent, any more than can it well be said to be a denial of her first marriage with Norman Andrews. The inference is without force.

There was a good common-law marriage in this state between the petitioner and the decedent, and the relations established and recognized for so long a time ought not to be set aside. The common-law marriage has been established very clearly by actual cohabita-

tion as husband and wife, acknowledgment, declarations, conduct, repute, and reception among friends and neighbors.

The facts presented justify holding that the parties were twofold married. They did in truth and in fact agree to enter into and sustain the marriage relation contracted at Philadelphia, Penn., on January 18, 1903, and likewise under our law on January 1, 1908. The marriage relation is too sacred to be trifled with. It is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family, and of society, without which there would be neither civilization nor progress. *Maynard* v. *Hill*, 125 U. S. 190, 210.

Emerson said: " It is said that in our license of construing the constitution and in the despotism of public opinion, we have no anchor; and one foreign observer thinks he has found the safeguard in the sanctity of marriage among us."

In my opinion, the petitioner has fully established her *status* as the widow of the decedent. Let the decree upon the final accounting distribute the estate according to this opinion.

Decreed accordingly.