In re BRUSH.

(Supreme Court, Appellate Division, First Department. February 11, 1898.)

1. WITNESS—COMPETENCY—TRANSACTIONS WITH DECEDENT.
    Under Code Civ. Proc. § 829, relating to competency of witness as to a personal transaction with deceased, one who claims to be the widow of a deceased person is not competent, in an action to remove the administrator, so that she may be appointed, to testify to an agreement with deceased by which a civil contract of marriage is claimed to have been made.

2. COMMON-LAW MARRIAGE.
    Where a man and woman have cohabited, and have had the reputation among their acquaintances of being married, and have held each other out as husband and wife, a previous agreement to become husband and wife may be inferred, from which a marriage may be established.

3. SAME—EVIDENCE.

In an action wherein one sought to prove she had become deceased's wife by civil contract, her testimony presumably corroborated by reputable witnesses, showed that she had cohabited with deceased as his wife for a number of years; that by reputation among acquaintances they were husband and wife; that he recognized her as his wife; and that she had a child by him. Testimony of the administrator showed that the child did not bear deceased's name, and was the result of previous cohabitation with another man, whose name it bore; that during her alleged cohabitation with deceased she was an inmate of houses of ill fame, where he visited her frequently; that her witnesses were disreputable women; that she had been arrested, and did not give the name of deceased in court; that deceased had a home with his sister; that she was never introduced nor sought recognition publicly as deceased's wife. *Held*, that the testimony is not sufficient to show a civil contract of marriage.

Appeal from surrogate's court, New York county.

Action by Jennie Brush against Jacob J. Brush, administrator of the estate of Joseph C. Brush, deceased, for the revocation of letters of administration to the defendant. From a decree of the surrogate court in favor of the plaintiff, granting the relief asked, defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, INGRAHAM, and McLAUGHLIN, JJ.

John W. Browne, for appellant.

John J. Vause, for respondent.

RUMSEY, J. On the 11th of June, 1895, Joseph C. Brush, who was a policeman in the city of New York, died intestate. Letters of administration upon his estate were issued to Jacob J. Brush, the appellant, on the 28th of June, 1895, without notice to the respondent. On the 1st of October, 1896, the respondent filed a petition in the surrogate's court, alleging that she was the widow of the decedent, and asking that the letters of administration issued to Jacob J. Brush be revoked, and that such letters be issued to her instead. An order was made by the surrogate to show cause why the prayer of the petition should be granted. It was served upon the then administrator, who appeared and contested it, and, after hearing before the surrogate, a decree was made revoking the letters issued to Jacob J. Brush, and directing that letters issue to the respondent as entitled thereto, as the widow of Joseph C. Brush. From this decree the administrator has appealed.

The petitioner, as the foundation of her right to be the administrator of the decedent, alleges that she is his widow; and the question presented to the surrogate was only whether, upon all the evidence in the case, this allegation was established. She makes no claim that any ceremony of marriage ever took place; but she bases her claim to be the wife of Joseph C. Brush upon the fact that there was an agreement of marriage between them, made in the year 1876, and from that time on they lived together as man and wife. The legal evidence of a formal agreement, in pursuance of which the relation of man and wife came to exist, and which was the foundation of the cohabitation of these two people, is entirely lacking. It is quite true that the petitioner testified at the close of the case to an express contract between herself and Brush, made in the month of May, 1876, to the effect that:

they should assume towards each other the relation of man and wife, but that there should be no ceremony of marriage performed, and that from that time on they lived together in pursuance of that agreement. But this testimony was entirely incompetent, under section 829 of the Code, and should not have been received over the objection of the appellant. Even were it competent, in view of the testimony of the petitioner and the numerous contradictions which it contained, and the fact that she, more than any one else, was interested in the result of this proceeding, it is very doubtful whether it would have been proper for the surrogate to rely upon it as a foundation for the decree which he made. As to the fact itself of an agreement, the petitioner contradicts herself. She states in her petition that the agreement was made about the 1st of October, 1876, whereas she states in her testimony that it was made in the month of May, 1876. There is no corroborative evidence of the fact that any such preliminary agreement was ever made, and no admission of it by Brush. No witness testifies to anything of the kind, and the only evidence bearing upon that subject at all is that of Mrs. Bazzoni, who testifies to an interview between the petitioner and herself after the death of Joseph C. Brush, in which she makes the petitioner say positively that she never was married to Brush; but subsequently she qualifies that statement by saying that Mrs. Brush declared to her that there was a written agreement of marriage between them, and this latter statement Mrs. Bazzoni insists upon in the face of a close and stringent cross-examination. But this testimony was mere hearsay. It was only the declaration of the petitioner herself, made after the death of her alleged husband, and it should not have been admitted, and cannot be relied upon as the foundation of any finding in the case.

We must start, therefore, in the examination of this case, with the fact that the living together of these two people, so far as they did live together, was not preceded by any ceremonial marriage, or by any express agreement that they should live together as man and wife. No ceremony is necessary to create the relation of man and wife in this state. The contract of marriage, so far as its inception goes, is regarded as is any other contract, and it may be begun by an agreement between the two interested parties that they assume towards each other the relation of husband and wife. That agreement, if it is not proven in express terms by competent evidence, may be established by the fact of cohabitation and reputation among their friends and neighbors, and of recognition of each other as holding that relation. Gall v. Gall, 114 N. Y. 109, 21 N. E. 106; Hynes v. McDermott, 10 Daly, 423, affirmed 91 N. Y. 451. But these facts, of themselves, do not constitute a marriage. They are simply evidence from which, if sufficiently strong, the courts are at liberty to infer that the cohabitation was the result of a previous agreement to become man and wife, and from that fact to infer further that a marriage actually existed between the parties. Gall v. Gall, 114 N. Y., at page 117, and 21 N. E., at page 108. It is quite true that it has been said that the presumption of marriage arising from cohabitation, apparently matrimonial, is one of the strongest known to the law. In many cases this is undoubtedly the fact. But this presumption is indulged in in the interest

of decency and clean living, and because of the preference which the law has for orderly and decent conduct as against licentiousness. The inference is not made for the benefit of either party to the alleged contract. If a woman who claims to hold towards a man the relation of wife sees fit to consent to the concealment of that relation, and while it exists to consort with prostitutes, and to live in a house of ill fame, receiving the visits of her alleged husband as women of that class receive the visits of other men, the fact that while she thus lives she is spoken of among the people of the class with whom she consorts, indiscriminately, as the wife or the friend of the man who supports her, does not entitle her to any particular consideration; and a cohabitation of that kind, while it possibly may be explained, and as explained may be used as a foundation for proof of marriage, is not of itself very strong evidence of the existence of that relation. The term "common-law wife" is one not known to the law, and the law looks with no favor upon the connection indicated by it. As properly used, this term is a synonym for a woman who, having lived in a state of concubinage with a man during the time when she might have been openly declared to be his wife, if she were such, only seeks to assume that relation openly after his death, and when she is impelled to it by the loss of the support which he has given to her, and by a desire to obtain that support by sharing in the proceeds of his property.

In this case the question presented is purely one of fact, to be determined upon the application of the rules laid down by the court in the cases above cited for the establishment of such a relation, and, for a proper decision of the case, it is necessary to examine with some care the testimony adduced by one and the other party, respectively. It appears from the testimony offered upon the part of the petitioner that in the spring of 1876 she was a servant in the employ of Dr. Clark, at the corner of McDougal and Houston streets, where she had lived about a year. She says that after she left Dr. Clark's she went to No. 50 Houston street, where she occupied rooms with Brush, who was then, and down to the end of his life, a policeman of the city. The beginning of the occupation at this place, as Mrs. Cook testifies, was early in the year 1876. The particular nature of that occupation does not appear. It is made to appear by the testimony that Brush lived, or pretended to live, with her in these rooms, and the witness says she supposed they were husband and wife, and they were spoken of as such; that Mrs. Brush brought to the witness' place linen to be washed; that some of this linen, among other things, was shirts and collars; and that once in a while Brush came for them, or stepped in and paid for them, saying that they were to be left there until Mrs. Brush came after them. But whether Brush really occupied the rooms with the petitioner, or as to the nature and extent of their cohabitation, the witness had no knowledge; nor does she attempt to state anything but her own conclusion as to the few facts which she knew, which, of themselves, were not sufficient to warrant her in drawing any very correct inference as to their relation. The petitioner seems, according to her testimony, to have stayed in these rooms about four months, and after that to have disappeared from the knowledge of the witness; and there is no satisfactory testimony offered by the petitioner as

to her whereabouts until she went, as she says, to the home of her mother, in Salem, Mass., to be delivered of her child, which, she says, was born there on the 20th of March, 1877. After the birth of her child, she makes her appearance in certain houses in Chrystie and Elizabeth streets. She produces, from that time on, a very considerable amount of testimony which may be summed up to the effect that she lived in certain houses in these two streets; that her child was with her a great portion of the time; that Brush lived with her in these several places; that she was spoken of as Mrs. Brush by the people who knew her; that Brush frequently spoke of her as his wife, and that she was so reputed and regarded by the persons with whom she consorted, and by those of her own relatives who, not living in New York, visited her infrequently at the several places where she lived. The testimony adduced by her tends to show that this situation continued from the time when she came back from Salem, after the birth of her child, to the death of Brush, in 1895, a period of 18 years. The witnesses produced by the petitioner to establish these facts were apparently reputable people, against whom no cause of suspicion existed, and who were apparently entitled to be credited as to the facts about which they testified. There can be no question that, when the petitioner had closed her case, she had produced for the consideration of the surrogate what must have been regarded then as weighty testimony, tending to show that she had cohabited with Brush as his wife for a period of nearly 18 years; that while she so cohabited she lived with him in reputable places; that they entertained friends, and were introduced generally as husband and wife, and that they were so regarded by the people among whom they lived. The witnesses produced by the petitioner, although interrogated upon that point, strenuously denied any knowledge that any of the houses in which this alleged cohabitation took place were houses of ill fame, or that they were frequenters of such places. On the contrary, they insisted that these houses were all respectable, and that they were all respectable people; and the weight to be given to their testimony depended almost entirely upon the fact that, at the time the petitioner closed her case, there was practically no evidence to contradict this assertion on the part of her witnesses.

But, when the administrator had finished the testimony produced by him, an entirely different aspect was given to this portion of the case. It will be remembered that, according to the testimony produced by the petitioner, her cohabitation with Brush commenced early in 1876, and the child which was the result of that connection was born in March, 1877. Her case rests entirely upon the truth of that statement. Some doubt, however, was thrown upon this statement by her mother, who said she was present at the birth, and that it occurred in the spring of 1876. It is quite true that, upon being confronted with the necessary inference to be drawn from this statement, the mother withdrew the testimony, and fixed the date of the birth as in the year 1877. Her testimony, taken as a whole, did not satisfactorily establish the latter year as the time of the child's birth; and the testimony presented by the administrator shows a totally different state of facts. It is conceded that the maiden name of the petitioner was

Mary or Mary Jane Whitehead, and that her mother's name was Catherine Whitehead, and that her mother resided in Pennsylvania. In 1876 the petitioner was a girl of about 18 years of age. These facts are undisputed. A witness was produced by the administrator who testified that in the month of January, 1876, a girl of about 18 years of age, whose name was Mary Whitehead, and whose mother's name was Catherine, became an inmate of the nursery and child's hospital at New Brighton, Staten Island, and that she remained there until the 16th of September, when she was discharged, and that during that time a child was born to her, whose name was entered upon the books of the institution as Frank Whitehead. Another witness produced by the administrator recognized the petitioner as the woman who, under the name of Whitehead, was an inmate of this institution at that time, and was there delivered of a child. The books presented show clearly that this Mary Whitehead was in that institution from January, 1876, until September, 1876, and there was no reasonable question but that this petitioner was the same woman. She testifies that she was not there, and she also testifies that she had no other child than the one who she insists is the son of Brush. But as to the first of these facts her testimony is clearly overthrown by the evidence produced by the administrator. It necessarily follows that the story told in her behalf, and by herself, that she began her intercourse with Brush in the spring of 1876, and lived with him at No. 50 Houston street during that summer and fall, is untrue; and with that portion of her story falls to the ground any inference that, when her connection with Brush began, she was a virtuous woman, for at that time she had already become the mother of a child by another man; and that, so far from living with him under the name of Mrs. Brush before the birth of this child, she did not live with him until after its birth, and she is first found living with him at a place which is not reputable. From these facts it must be inferred that the cohabitation between these parties was not matrimonial in its inception, but was meretricious; and there is no evidence in the case which would warrant the conclusion that that connection, thus begun, ever changed its character to that of a matrimonial connection. It was made to appear by the appellant, and it was practically not denied, that from the time when, in 1880, the petitioner went to live at the house No. 110 Chrystie street, down to the year 1892, with the exception of about 14 months, the different places where she resided were houses of ill fame, and that the women who testified to her relations with Brush were, with perhaps two exceptions, either prostitutes or frequenters of those houses in one capacity or another. It appeared, too, that men who had testified as to her relations with Brush, and that they regarded her as his wife, had become acquainted with her in these places, and only knew her there, although they had strenuously denied that they had any idea that the places were not reputable in their character. It further appeared that during all this long period of time she was not known by the name of Brush, but as Jennie Ross; that she was arrested more than once as an inmate of a house of ill fame, and that each time she said that her name was Ross. Although Brush, during all this time, was a policeman, and the witnesses produced by her had testified

that they had seen him frequently in her rooms, so that they were able to say that he lived there, yet each of these witnesses testified that he was never there in uniform, and except on one occasion they do not pretend ever to have seen him in his uniform about the place where Jennie Ross lived, and that exception related to an occasion as to which no inference could be drawn that he was there as an inmate of the place. While the witnesses for the petitioner testified in a general way that Brush lived in these various places with her, yet they do not testify to any special acts by which the correctness of the inference that Brush lived there can be verified. On the contrary, it was made to appear on the part of the administrator, by testimony that cannot be gainsaid, that, during all these years when the petitioner's witnesses had testified that Brush lived with her at these houses of ill fame, he owned and occupied a house at No. 32 Morton street with his sisters; that he went in and out of that house, and slept and took his meals there, as though he resided there; and that there was no reason to suppose he resided anywhere else. The evidence is overwhelming that he never lived in those houses with this woman. The petitioner's child was for many years known as Frank Ross, and he went to school and was carried upon the books of different schools in the city under that name. The administrator produced a witness named Zachary Ross, who had been an engineer on the Pennsylvania Railroad, and who testified that during the year 1875 Mary Jane Whitehead lived with him as his mistress, and that after that time he understood that she had a child. It was claimed on the part of the administrator that this child, Frank Ross, was the result of the intercourse between Zachary Ross and the petitioner, and that he received the name of Frank Ross because of the name of its putative father. Although Ross testified to his intercourse with this woman, he was not able to recognize the petitioner as the woman to whom he referred; which he explained by saying that it was a great many years ago, and she must have changed very much in the meantime. It is quite true that the petitioner denies that she ever had any connection with Zachary Ross, or that she was ever delivered of a child in the Staten Island Hospital; but it is equally true that she denied just as strenuously that she was ever known by the name of Jennie Ross, or that her child was ever known by the name of Frank Ross, and no more weight can be given to her denial in the one case than in the other.

It appeared that during the time that she lived at these various houses of ill fame Brush visited her with more or less frequency, for the purpose for which one is supposed to go to such places; that he was recognized by the people in these houses as the friend of Jennie Ross; and that sometimes, in view of the relation which seems to have continued for many years, she was called among those people "Mrs. Brush," and sometimes Brush used the same phrase, or called her his wife in speaking of her; and it is in evidence that when she had been arrested as an inmate of a house of ill fame, on one and perhaps on two occasions, Brush employed an attorney to take care of her interests, and paid her fine, and at that time spoke of her as Mrs. Brush. But it is also in evidence that at one of these times Brush

went to the policeman who had arrested this woman, and told him that his girl had been arrested, and he would be glad if she could be released, and he pointed out the petitioner as the person to whom he referred.

It appears from all the testimony in the case that while this woman was known to some extent among the class of persons with whom she consorted by the name of Mrs. Brush, and while Brush was called her husband or friend (which words seem to have been used somewhat indiscriminately by these people), yet she never claimed any recognition as his wife outside that class of people. Although he once in a while is said to have presented her to an acquaintance by that name, he never recognized her publicly as bearing that relation to him. The existence of any such relation on his part was never suggested by him to any of his own friends or people. She never insisted upon being recognized as his wife, but was content to live in the situation in which she did live, apparently bearing the relation which women of that class bear to the men who keep them, without claiming in a reputable place, among reputable people, recognition as the wife of a reputable man; which, if her story be true, she was entitled to have. When Brush was sick of his last illness, she made no effort to be present at his bedside. She made no claim then to have the right to take the place to which her position as his wife entitled her, and where her duty called her if she were his wife. After his death, and when she went to the house in an effort to see his body, she did not announce herself as his wife, but simply said that he had been good to her for a great many years. It is true that certain of the witnesses who were her friends say that she spoke of Brush as her husband immediately after his death. But this fact, if it be a fact, does not explain why she should not have made that claim at his house, why she should not have made it at his bedside, and why, when he was dead and she desired to see his body, she should not have claimed the right to do it as his widow. The fact that she failed to assert her rights at that time is strong evidence that she had no rights to assert.

We have not thought it necessary in this opinion to particularize the evidence of each witness. We have sought only to give the conviction which was produced by a careful reading of all the testimony in the case. That conviction is that although, upon her prima facie case, the petitioner adduced evidence enough, if it had been unexplained, to warrant a finding that she was the wife of Brush, yet when that evidence was explained, and the source from which it came laid open, and it was interpreted in the light of uncontradicted facts, the case of the petitioner disappears; and that it must be found, as the result of all the testimony, that during these years she was not, and did not pretend to be, his wife, but only his mistress; and that her claim to be his wife was the result of the necessities which came upon her after his death, aided, perhaps, by suggestions which she undoubtedly received in that direction.

The decree must be reversed, and the petition for revocation of the letters of administration denied, with costs. All concur.