LEON G. DODGE and Others, Plaintiffs, *v.* LILLIAN CAMPBELL (Calling Herself MARY ALEXANDER DODGE), the NATIONAL CITY BANK OF TROY, NEW YORK, and MARY ALEXANDER DODGE (LILLIAN CAMPBELL), as Administrators of the Goods, Chattels and Credits of BYRON G. DODGE, Late of the Town of Berlin, New York, Deceased, Defendants.*

Supreme Court, Rensselaer County, November 21, 1929.

* Affd., 229 App. Div. ——. See, also, 128 Misc. 778; 223 App. Div. 471.

*Heaton & Mambert* [*Albert E. Mambert, Edward L. Ryan* and *John T. Norton* of counsel], for the plaintiffs.

*Frederick E. Draper* [*James V. Coffey* of counsel], for the defendants.

FOSTER, J. The plaintiffs in this action are the children of Byron G. Dodge, deceased, by his former wife, Annie Smart Dodge. It is their claim that the defendant Lillian Campbell, calling herself Mary Alexander Dodge, and who claims to be the widow of the decedent, was never lawfully married to him and is not entitled to any interest in the property of which he died seized,

and they seek a declaratory judgment based upon this claim and the evidence given thereunder. The defendant mentioned denies the pertinent allegations in the complaint, and asserts as an affirmative defense that she was lawfully married to the decedent prior to his decease, and is his lawful widow, and as such entitled to the benefits to be derived from such status. To avoid needless repetition in the remainder of this opinion, Lillian Campbell or Mary Alexander Dodge will be referred to as the defendant, as if there were but one defendant in the action, the other defendant, the National City Bank of Troy, having no interest other than a passive one in the result of this litigation.

There are certain facts which I deem clearly established by the evidence and a statement of these facts, in the order of their occurrence, will serve to clarify the issues involved. They are as follows:

The defendant was married to John F. Campbell at the city of Lancaster in the State of Pennsylvania on the 24th day of June, 1893. She and the said John F. Campbell lived together as man and wife in the State of Pennsylvania for a period of about five years. In or about the year 1898 the said John F. Campbell left the defendant and never returned. After the disappearance of John F. Campbell the defendant lived with her relatives in the State of Pennsylvania until the year 1899 or 1900, when she entered the service of Byron G. Dodge and his family as a servant, and there remained for a period of about six months. At that time Byron G. Dodge was living with his former wife, Annie Smart Dodge, and their children in the city of Lancaster, Penn. At the termination of the six months' period of service the defendant returned to her relatives and remained with them until about the year 1904, when she again entered the service of Byron G. Dodge in the city of Lancaster as his housekeeper. Prior to this date Byron G. Dodge and his wife separated and did not thereafter live together. After 1904 the defendant remained with Byron G. Dodge until his death. On March 26, 1921, Byron G. Dodge was granted a final decree of absolute divorce from Annie Smart Dodge in the Court of Common Pleas for the county of Lancaster, Penn. In April, 1921, Byron G. Dodge left the city of Lancaster, Penn., and went to Berlin, N. Y., and later to the city of Troy in this State, and thereafter remained, with the exception of a few intervals, until a short time prior to his death. The defendant accompanied him from Lancaster to Berlin, and to the city of Troy, and lived with him at the premises known as No. 6 Washington Place in said city, the title to which was taken in her name as his wife. On the 4th day of March, 1924, the defendant instituted a proceeding in the

Supreme Court of this State, under the provisions of section 7-a of the Domestic Relations Law (added by Laws of 1922, chap. 279), and laid the venue thereof in Albany county, to have dissolved her marriage with John F. Campbell upon the ground of his absence for more than five years. In this proceeding, and on the 20th day of June, 1924, an order and judgment was made dissolving the marriage between the defendant and John F. Campbell. On the 9th day of October, 1924, at the village of Cambridge in Washington county, N. Y., the defendant and Byron G. Dodge procured a marriage license and were there married by a minister of the Presbyterian church. Thereafter, and on or about the 1st day of November, 1925, Byron G. Dodge died intestate at Reading in the State of Pennsylvania. John F. Campbell survived the death of the said Byron G. Dodge, and died at Milwaukee, but a resident of the city and county of Waukesha in the State of Wisconsin, on the 12th day of June, 1926.

These facts, as I find them, constitute a bare outline of events in the lives of the people affected, but will serve to focus attention upon two particular issues. The chief attack of the plaintiffs is against the validity of the dissolution proceeding taken by the defendant to dissolve her marriage with John F. Campbell, and this attack is predicated upon the theory that the court, in said proceeding, did not have jurisdiction. Since it is found that John F. Campbell lived until the 12th of June, 1926, the defendant could not have contracted a valid marriage after March 25, 1922, unless her previous marriage with Campbell was dissolved in accordance with the provisions of section 7-a of the Domestic Relations Law, which went into effect on the date last mentioned. The plaintiffs, therefore, urge that if the dissolution proceeding was invalid, then the defendant could not have been, and was not, lawfully married to the decedent, and they further urge that under the pleadings the only issue presented is the validity of the dissolution proceeding. Without conceding the invalidity of the dissolution proceeding, the defendant contends that she is entitled to raise the issue of a common-law marriage by virtue of her denial of the allegations in the 11th paragraph of the complaint, and also by reason of her affirmative defense, wherein she alleges that she was lawfully married to the decedent prior to his death. The 11th paragraph of the complaint is as follows: " That said defendant Lillian Campbell was never lawfully married to the decedent, Byron G. Dodge, is not his widow and is not entitled to dower in his real property or to any right, share or interest in his personal property."

The plaintiffs say that a denial of the vital allegation in this

paragraph raises no issue because such allegation is merely an unnecessary conclusion and corollary to prior allegations. I do not agree. The statement that Lillian Campbell was never lawfully married to the decedent is a necessary allegation of fact which the plaintiffs must prove before they are entitled to a declaratory judgment decreeing such to be her status. Even if the dissolution proceeding and the ceremonial marriage thereafter performed are both held to be invalid, it does not necessarily follow that the defendant was never lawfully married to the decedent. But such is the general conclusion which the plaintiffs seek to have drawn and embraced within the scope of a declaratory judgment. To adopt such a construction of the pleadings permits the plaintiffs to establish the status of the defendant as a general conclusion drawn from a specific episode, when as a matter of fact her status may have been acquired in a totally different manner. The position of the plaintiffs, reduced to its essence, is that under the pleadings the defendant cannot establish a matrimonial status with the decedent except by way of the dissolution proceeding against her former husband. A fair and liberal construction of the pleadings does not sustain such a proposition. If, as the defendant claims, she was the common-law wife of the decedent prior to the dissolution proceeding against Campbell, her status in that regard cannot be destroyed by a narrow and restricted construction of the pleadings. The very purpose of the action is to establish her status, and under the pleadings and the circumstances disclosed I hold that the issue of the common-law marriage is presented.

In this case there could not have been a valid marriage, either by common law or otherwise, between the defendant and Byron G. Dodge except during the period between March 26, 1921, when he received a final decree of divorce from Annie Smart Dodge, and the 25th day of March, 1922, when section 7-a of the Domestic Relations Law went into effect as a part of the statute law of the State. The disability of the parties previous to March 26, 1921, is obvious, because prior to that time Dodge had a wife living from whom he had not been divorced. After March 25, 1922, when section 7-a was added to the statute and went into effect, the defendant was under the same disability because she had a husband living, and after that date the provisions of section 7 of the old statute with reference to voidable marriages was no longer in force and effect. Previous to March 25, 1922, under section 7 of the old statute, a marriage was void from the time its nullity was declared by a court of competent jurisdiction if either party thereto had a wife or husband by a former marriage living, and such former wife or husband had absented himself or herself for five successive years last past without

being known to such party to be living during that time. A marriage contracted under such circumstances was voidable but not void unless declared so by a court of competent jurisdiction. Therefore, between March 26, 1921, and March 25, 1922, the defendant might lawfully have entered into the relation of matrimony with Byron G. Dodge, providing that John F. Campbell had absented himself for five successive years or more previous thereto, without being known to her to be living during that time. If she did contract such a marriage during that period, it was valid for all intents and purposes, because concededly it was never declared void by a court of competent jurisdiction. (*Stokes* v. *Stokes*, 198 N. Y. 301.) It is the defendant's contention that the possibility mentioned was the actual occurrence, and that she became the common-law wife of Byron G. Dodge some time after March 26, 1921, and prior to November 1, 1921. The significance of the date last mentioned will be considered hereafter.

Before considering the evidence from which the defendant asks that an inference of a common-law marriage be drawn the query as to her competency to contract such a marriage is pertinent. She was not competent, of course, if she knew her former husband, John F. Campbell, to be living during that time, and knowledge under the former statute meant something more than a passive acceptance of abandonment without inquiry. The requirements of such knowledge are stated in *Stokes* v. *Stokes* (*supra*): " Knowledge within the true meaning of the statute involves all that a person of ordinary prudence would have discovered under like circumstances by an inquiry conducted in good faith with the diligence required by the importance of the subject. The inquiry must be made with an honest effort to find out the truth, not to overlook it so as to be able to testify that nothing was discovered. A careless or dishonest inquiry affords no protection."

From the disclosures made in the case it does not appear that the defendant made either a careless or dishonest inquiry as to whether or not Campbell was alive. In fact it is apparent that she did all that a person of her education and station, in the exercise of ordinary prudence, would have done under the circumstances which surrounded her. Campbell left her suddenly and with the evident intent to never return. He disappeared into the great maw of the middle west and returned to visit his relatives upon only two occasions. Both of these visits were surreptitious in their nature, and from the testimony of those who saw him it is evident that he desired to conceal his whereabouts. The first visit was not made until about seventeen years after his disappearance, and the second visit was seven years later. On both occasions he

saw only four or five close relatives and one neighbor, Ezra Bowman. He wrote letters at times to relatives, or had other people write for him, and was also in communication with his attorney, W. U. Hensel; but it is quite apparent that none of these people made any disclosures calculated to lead to a discovery of his existence or his whereabouts. These matters are not material except they show the closeness with which he had drawn about him the veil of secrecy and silence.

After he disappeared, the defendant employed an attorney, Frank S. Groff of Lancaster, Penn., to locate him, and she also made inquiries of friends and neighbors in the vicinity where they had lived together. Apparently she made no inquiries of Campbell's sister or other of his relatives, and this failure she excuses on the ground that they were not friendly to her. The circumstances surrounding Campbell's disappearance, the testimony of his relatives and their evident desire to shield his existence and whereabouts, justify, I think, the conclusion that they were not friendly to her. Due diligence did not require her to pursue a line of inquiry which she had good reason to believe would be futile. The testimony of Campbell's relatives leads to the conclusion that her belief in such respect was well founded.

She is corroborated by Groff as to his employment by her to locate Campbell, and his testimony shows the efforts made in that direction. The fact that this employment was prompted by a desire for support certainly cannot be held to have lessened the diligence of the inquiry. Groff's efforts continued until 1904 or 1905, when he was finally informed by Hensel, Campbell's attorney, that he had heard that Campbell was dead. This information was communicated to the defendant by Groff, and she received the same information from other people, although apparently it all emanated from Hensel. After that Groff's employment ceased but the defendant says that she continued to make inquiries of different people near her old home, although she then believed Campbell to be dead. At the time she claims to have contracted a common-law marriage with Byron G. Dodge in 1921 Campbell had been absent for about twenty-three years. He had drawn about his existence a wall of silence, behind which he moved in secrecy except as to a few of his immediate relatives who aided and abetted him in his evident desire for effacement. With the resources she possessed, the defendant did all that the average person of her intelligence and station could have reasonably been expected to do in seeking to ascertain whether he was alive or dead, and from the circumstances disclosed she was justified in the belief that he was dead.

There now exists the further query of whether she and the defendant were united by common-law marriage. A common-law marriage is defined as a present agreement between competent parties to take each other for husband and wife. The law does not require that the agreement be in writing, nor are witnesses necessary; indeed, the essence of the relationship is not dependent upon a mere formal contract. (*Matter of Seymour*, 113 Misc. 421.) Such a marriage may be proved by showing actual cohabitation as husband and wife, the acknowledgment of the relationship, declarations, conduct, repute, reception among neighbors and the like. (*Gall* v. *Gall*, 114 N. Y. 109, 118; *Wilson* v. *Burnett*, 105 Misc. 279.) Any mutual agreement between a man and woman to be husband and wife *in præsenti*, followed by cohabitation, constitutes a valid and binding marriage. An actual marriage may be presumed from matrimonial cohabitation and acknowledgments of the parties. A mere formal contract is not the essential thing. Marriage is a status which may be established by the words, actions and lives of the parties, evidencing their understanding and intent. The general definition of matrimonial cohabitation is the living together of man and woman ostensibly as husband and wife. (*Pollock* v. *Pollock*, 71 N. Y. 137.) With reference to the requirements of proof from which a common-law marriage may be inferred, Judge RUMSEY, in *Matter of Brush* (25 App. Div. 610), said: " That agreement, if it is not proven in express terms by competent evidence, may be established by the fact of cohabitation and reputation among their friends and neighbors, and of recognition of each other as holding that relation. (*Gall* v. *Gall*, 114 N. Y. 109; *Hynes* v. *McDermott*, 10 Daly, 423; affd., 91 N. Y. 451.) But these facts, of themselves, do not constitute a marriage. They are simply evidence from which, if sufficiently strong, the courts are at liberty to infer that the cohabitation was the result of a previous agreement to become man and wife, and from that fact to infer further that a marriage actually existed between the parties."

In the light of these authorities upon the question, the evidence presented by the defendant to sustain the inference of a common-law marriage possesses great weight.

It appears that in April, 1921, soon after Dodge had secured a final decree of divorce from his first wife, he and the defendant went to his farm at Berlin, near the city of Troy in this State, and there lived together until November or December, 1921. Then they moved into the city of Troy and thereafter lived at the premises known as No. 6 Washington place. It appears from the testimony of witnesses of good repute and whose credibility can scarcely be questioned that about this date and continuing thereafter, the

defendant was introduced by Dodge to employees, business people and others as his wife. There is testimony to show that he referred to her on many occasions as his wife. It also appears that they had their meals together at the premises last mentioned, and occupied the same apparently as man and wife. The conduct and declarations particularly considered here occurred prior to March, 1922, although there is credible evidence of subsequent declarations to the same effect. The strongest evidence, however, in favor of the inference is found in the circumstances surrounding the acquisition of the property known as No. 6 Washington place. It appears that negotiations for the purchase of the property were made by Dodge, and that, at his direction, the title to the property was taken in the name of the defendant as Mary Alexander Dodge. The deed, which is defendant's Exhibit N, is dated November 1, 1921, and recites that the conveyance is made to Mary Alexander Dodge, wife of Byron G. Dodge. On the same date the defendants gave back a bond and a purchase-money mortgage upon the same premises (defendant's Exhibits A and B) in both of which she is described as Mary Alexander Dodge, both in the bodies of the instruments and in the acknowledgments thereof. The acknowledgment to the mortgage is dated December 22, 1921, and it appears that both the deed and the mortgage were recorded on that date. These were instruments executed with all of the solemn formality attending the execution of important documents. They were to become matters of public record and this fact must have been known to the decedent. I can scarcely conceive of any higher form of evidence to sustain the claim of a common-law marriage. It was equivalent to a solemn, public declaration and acknowledgment on the part of Dodge that a state of matrimony existed between him and the defendant. Evidence of this character was given great weight in *Matter of Seymour* (*supra*), the only difference being that in the case cited the instruments which contained analogous recitals were made by the husband instead of the wife. In this case, however, the instruments were made at the direction of Dodge and certaintly with his acquiescence and consent; hence they are entitled to the same force and effect as if he executed them himself.

As against this evidence produced by the defendant, the plaintiffs have shown acts on her part which are inconsistent with her claim. They have shown that Dodge, in the spring of 1921, told a neighbor that he had secured a divorce and was free to marry again; and that later, in 1923, he told the same neighbor that he was not married to the defendant and that she was in no hurry to get married. There is other testimony to show that the decedent

referred to the defendant as Miss Alexander at different times, but the times are not fixed with even approximate certainty, and as to that particular class of testimony the matter of time is of extreme importance. This class of testimony as presented by the plaintiffs is scanty, and rather weak in probative force when balanced against the same kind of evidence offered by the defendant.

As to the class of testimony which relates to inconsistent acts and declarations on the part of the defendant, the plaintiffs stand on firmer ground. The dissolution proceeding which she caused to be taken was, in itself, an inconsistent act. In that proceeding, and upon the advice of counsel, she practiced deception upon the court and testified falsely as to her residence. In her application for the marriage license prior to the ceremonial marriage at Cambridge on October 9, 1924, she swore that her name was Mary Alexander, and that the pending marriage was her first one. She told the minister who performed the ceremony that it was her first wedding. These inconsistent acts and declarations are established beyond dispute but not beyond explanation. The mere fact that they exist does not destroy the status of a common-law marriage, if one existed. They can only be considered upon the proposition of whether such marriage did, in fact, exist. If it did, then it is immaterial what were the subsequent acts and declarations of the defendant because they, of themselves, would not destroy the status once it was established.

In this case there is, I think, a logical explanation of the acts and declarations of the defendant which, despite their inconsistency, bears the stamp of truth. It may well be doubted whether she understood the legal significance of a common-law relation. It is a status shielded by the protection of law but in contravention of a long-established convention of society. It is known to but few as a lawful relation and regarded by the vast majority of people as a dubious relation, to say the least. It was wholly natural, therefore, for her to desire a ceremonial marriage and this she could not obtain without a dissolution of her previous marriage. In order to obtain the latter, she commenced the dissolution proceeding, and to avoid publicity she fell into the gross error of practicing deception upon the court in stating that she resided in the city of Albany. To procure a marriage license it was necessary for her to use a different name from that of Mary Alexander Dodge, or else subject herself to embarrassing explanations. She stated her proposed marriage to be her first venture in matrimony because she undoubtedly believed that the dissolution decree had dissolved her former marriage. In short, her whole conduct with reference to this episode, inconsistent and erroneous in part as it may have been,

indicates that it was a result of her desire for a ceremonial marriage rather than an admission that she was not the common-law wife of the decedent.

On the other hand, there is no adequate explanation for the acts and declarations of Dodge with reference to the defendant, and in connection with their life together after March 26, 1921, and in the purchase of the property on November 1, 1921, except to indicate that they had agreed to become man and wife and occupied that relationship. If, as the plaintiffs insinuate, she was merely the mistress of Dodge, she could have continued that position as well under the guise of housekeeper as that of a wife. She had been his housekeeper for many years. If their relations prior to 1921 were immoral there was no occasion in that year to suddenly seek to hide their immorality behind the guise of pretended matrimony. There was no greater danger of discovery then than in previous years. To be sure, Dodge then, for the first time, possessed freedom to marry and it seems significant that shortly thereafter he began to declare the defendant his wife.

I am constrained to hold, in balancing the evidence for the defendant against that produced by the plaintiffs, that a common-law marriage was entered into between the defendant and the decedent some time between March 26, 1921, when Dodge secured his divorce, and November 1, 1921, when title to the premises at No. 6 Washington place was taken. The exact time and place is not fixed, but these facts are not essential. As was said in *Matter of Seymour (supra,* at p. 427): " The law does not require to know when and where the agreement was made. No witnesses are requisite, nor need the time and place be pointed out. Curiosity may be gratified; but justice is satisfied by having the existence of the contract determined."

It follows that if this conclusion is correct, it is decisive of the case. The marriage so concluded was voidable but not void, and since it was never declared void by a court of competent jurisdiction it must be deemed to be valid for all intents and purposes of this case. The defendant, therefore, is the lawful widow of the decedent, and as such is entitled to all the benefits of that status. In view of these conclusions it is unnecessary to pass upon the questions presented as to the validity of the dissolution proceeding and the ceremonial marriage. As a logical consequence of this decision, those acts must be held to have been futile, and on that ground nullities; but whether they may have been valid or invalid upon a different theory is not here determined.

Judgment for the defendants in conformity with this decision, dismissing the complaint, with one bill of costs.