**Della J. McSWEENEY, Plaintiff,**

v.

**Anthony J. CELEBREZZE, Secretary of Health, Education and Welfare, Defendant.**

Civ. A. No. 64 Civ. 1809.

United States District Court
S. D. New York.

March 31, 1966.

surance Benefits—is based upon facts which are supported by substantial evidence and valid conclusions of law in the light of the record considered as a whole.

Della Hassett McSweeney, old, alone and impecunious, presents a case that cannot fail to evoke sympathy. Now seventy-three years of age, she lived for thirty-four years with Callaghan L. McSweeney until his death on December 9, 1962. Her open and continuous cohabitation with him—a relationship marked by mutual devotion and requited love—and their repute in the community as husband and wife are accepted facts. Equally undisputed is the circumstance that Della and Callaghan never solemnized their alliance by a civil or religious marriage ceremony.

Did their relationship represent the union of man and spouse or the liaison of lover and paramour? Rejecting Della's claim for social security benefits as Callaghan's widow, the government has decided—despite much evidence strongly pointing the other way—to accept what it regards as substantial proof of greater credence and plausibility, supporting the conclusion that Callaghan and Della never intended to and never did take each other as husband and wife.

Judicial review in this case requires a close examination of the entire record of testimony and exhibits and

Irwin A. Rosenberg, New York City, for plaintiff.

Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, for defendant, Alan G. Blumberg, Asst. U. S. Atty., of counsel.

HERLANDS, District Judge:

Plaintiff, Della J. Hassett McSweeney, has moved "for an order granting the plaintiff judgment upon the pleadings herein and * * * transcript of the record, pursuant to Section 405(g) Title 42, United States Code * * *."

The ultimate issue is whether the administrative decision [1]—that plaintiff was not the common-law wife of Callaghan L. McSweeney under the substantive law of New York State, and, therefore, not entitled to Widow's In-

---

1. The decision of the hearing examiner, dated January 20, 1964, rejecting plaintiff's claim for widow's insurance benefits, is the final administrative decision inasmuch as plaintiff's request for a formal review was denied on April 15, 1964.

On December 19, 1962, plaintiff filed an application for survivor's insurance benefits (Exh. 2) and a statement of marital relationship (Exh. 3). On February 20, 1963, she filed a "Statement of Claimant" (Exh. 18). Another such statement was filed by her (Exh. 17). On April 8, 1963, an adverse "Special Determination" as to "Common-Law Marriage" was rendered by a reviewer. On May 24, 1963, a "Notice of Determination of Claim" advised her that her claim had been disallowed and that she could request a re-examination and reconsideration of this determination (Exh. 6). On June 11, 1963, she requested a reconsideration of her case

(Exh. 7). On July 30, 1963, an adverse "Reconsideration Determination" advised her that this reconsideration was an independent re-examination of all of the evidence on record, made by "a specially trained staff, different from the staff that made the original decision" (Exh. 8; Record, p. 114). On October 29, 1963, a hearing examiner took the testimony of the plaintiff, her niece and a friend, who appeared as witnesses. The hearing examiner's decision was rendered on January 20, 1964.

In the course of the administrative inquiry affidavits, letters and other documents were obtained, submitted or examined and various witnesses were interviewed. This evidence is contained in the transcript of the record now before the court. The court has analyzed all of this evidentiary material.

an analysis of all permissible inferences. The decisive issue is not how this court would have decided the case as an original proposition but whether the administrative determination is supported by substantial evidence considered in the light of the record as a whole. This rule of substantiality is one of qualitative analysis, not merely a quantitative inventory of evidentiary items. In discharging that function, the court must evaluate the direct and circumstantial evidence and apply to that evaluation the governing criteria of judicial review of administrative decisions.

The focus on the crucial issue can be further sharpened by pointing out that the government has explicitly recognized that, prior to April 29, 1933, common law marriages were lawful in New York State; and that, if Della had proved a common law marriage to Callaghan prior to that date, she would have been entitled to the widow's benefits she now seeks.

The whole case, therefore, hinges on the question whether there was substantial evidence before the administrative agency, considering the record as a whole, on the basis of which the agency could properly have found, as it did, that Della and Callaghan never entered into a common law marriage during the years prior to April 29, 1933.

Della J. Hassett and Callaghan L. McSweeney met in 1928. At the time she was thirty-five;[2] he was thirty-two.[3] They were single and nubile. Neither suffered from any legal disability or physical impediment in the path of marriage. He had no friends or relatives in this country. She lived with a widowed sister and niece.

The circumstances of how and when they commenced living together must be reconstructed in order to determine whether there is substantial evidence in the record as a whole to support the government's findings (1) that the relationship was illicit in its inception and (2) that Della has not adduced evidence to neutralize the inference that the meretriciousness continued and that she has failed to establish that Della and Callaghan ever entered into the covenant of marriage *per verba de praesenti.*

*When and How the Cohabitation Began* [4]

1. According to Della's application for survivor's insurance benefits (Exh. 2) and her "statement of marital relationship" (Exh. 3), both dated and filed December 19, 1962, ten days after Callaghan's death:

In response to question [1(a)] in Exhibit 3, "When did you begin living together?," she answered "April 1931" and that they lived "together continuously since that time." However, in answering question [2(b)] in Exhibit 3, "Where have you lived together and for what periods of time?," she answered, "From 4/28 to 12/62." [5]

In response to question 8 in Exhibit 2, she said she married Callaghan in "April 1931" and that the marriage was "common-law."

In response to specific questions in Exhibit 3, she answered that she had an understanding as to their relationship when they began living together; that, as to their living together, "We loved [one] another and would be man and wife"; "we would live together for the rest of our lives."

2. According to Della's application for a lump-sum death payment (Exh. 5), dated and filed February 6, 1963:

In response to question 9, she replied that Callaghan married her in April 1931. Under the heading, "Remarks," she said: "Mr. McSweeney and I never

2. She was born January 5, 1893 (Exh. 2).

3. He was born May 22, 1896 (Exhs. 1, 9).

4. Citations are to the pages and exhibits in the transcript of the administrative proceedings before the Department of Health, Education, And Welfare, Social Security Administration.

5. In the figures "4/28" there appears to be a correction by over-writing. Perhaps she first wrote "4/31" then altered "31" into "28".

went through a marriage ceremony. We have been living in common-law relationship since 1931." [6]

3. According to Della's undated "Statement Of Claimant" (Exh. 17), she declared (125):

"I and Callahan [sic] McSweeney began living together as husband and wife in April 1928. * * * we became husband and wife in 1928." [7]

4. According to Della's "Statement Of Claimant" (Exh. 18), dated February 20, 1963 (127–130), she and Callaghan "began living together in 1928" (127). As to "1931", she said: "The interviewer who spoke to me originally must have misunderstood. I never said 1931." (127).[8]

5. According to Della's letter of June 11, 1963 (Exh. 7), she and Callaghan "lived and worked together since 1928." (107, 109).

6. According to Della's testimony at the hearing of October 29, 1963, she was residing with her widowed sister and niece in a four-room apartment in November 1928. Her niece was taking Irish dancing lessons from Callaghan L. McSweeney, who was a professional instructor. One day she brought him up to the apartment and introduced him to Della. In about a week after this first meeting, Della and Callaghan began sharing the same bed in a separate room in that apartment (52–54). Neither she nor he had been married previously; and they were not married before beginning to cohabit (55, 56). They continued living in that same apartment with her widowed sister and niece "for a couple of years" (57).

7. According to the statement of Della's niece, Marion Muscatello (Muscatel), dated December 20, 1962 (Exh. 20), Della and Callaghan "lived together since 1928" as husband and wife; they main-

tained a home and lived together continuously to 1962; and since childhood she always knew Callaghan and Della as her uncle and aunt (132–133).

8. According to the affidavit of Marion Muscatello, sworn to January 21, 1963, Della and Callaghan cohabited "from December, 1928 to the date of" Callaghan's death as man and wife (134).

9. According to the testimony of Marion Muscatello at the hearing of October 29, 1963, Della and Callaghan first met under the following circumstances: Marion, when thirteen years old, took Irish step-dancing lessons from Callaghan. She introduced him to her aunt, Della, in early December 1928 (71, 73). Della and Callaghan started going together; he visited their home regularly and then, after about nine months or a year, he moved into their apartment and lived there permanently (73–74). Della and Callaghan occupied their own room in the apartment; Marion "just took it for granted that they got married" (74, 75, 78).

10. Ethel McGlone, another niece of Della, made a statement on December 20, 1962 and signed an affidavit on January 21, 1963 (Exh. 21) that are the same as Marion Muscatello's.

*Why a Marriage Ceremony Did Not Take Place*

1. According to Della's "statement of marital relationship" dated December 19, 1962 (Exh. 3), she believed that their living together made her legally married because "New York accepted a common law marriage"; that they did not have a ceremonial marriage because "we didn't think we needed one"; and that there was no agreement or promise that a ceremonial marriage would be performed in the future.

2. According to Della's statement of February 20, 1963 (Exh. 18), when she

---

6. When she wrote "1931" she had started apparently to write some other figure than "3".

7. "28" appears to have been superimposed over some other numerals in both figures of "1928".

8. The hearing examiner regarded her "explanation for the conflict" as "not persuasive" (20).

and McSweeney began living together in 1928, "I felt I was just as legally married to Mr. McSweeney as if we had been married at City Hall"; "We figured we'd leave things as they were and not have a ceremony until he retired"; "We planned to buy a house in Ireland then and have a ceremony when we went to live there because people over there are very moralistic." (127). Just before Callaghan died and while he was at the V.A. hospital, she "tried to get the priest to marry" them. Concerning this incident, she says (127): "I told him we'd never been married in a church or 'legally'. He wouldn't do it, said it was a legal matter." (127).

3. According to Della's letter of August 1, 1963 to the administrative agency, they had planned to "get married when we [they] retired in 1961" at which time they "intended to go to Ireland to settle there." She further wrote: " * * * sorry to say sickness prevented that[.] I had been a very sick Woman, up to the time that my Husband had a stroke" (38–39). In this letter, she also said: " * * * there was every intention of getting married, it was a matter of putting it off from time to time as those years were very hard years of depression a man could not buy a job so I had to work most of the time myself, and supported and kept Mr. McSweeney so eventually we had to take jobs as Janitors and Superintendents of apt Houses for very small wages * * * so thats how it went on * * * " (42–43).

4. According to Della's testimony at the hearing of October 29, 1963, they did not enter into a formal marriage before commencing cohabitation because "It was a passionate love affair" and "it's just a matter of putting it off from time to time. * * * Maybe I was a little slow in making a decision myself because I wanted to help my sister so much" and Callaghan had no job at the time (56).

She also testified that Callaghan was "always very anxious for me to marry him and he'd bring up a taxi to bring me down to the church"; "I was a little slow on that sir * * * I was kind of reluctant to leave at the time"; "I kept putting it off and putting it off until eventually" her niece, Marion, married; and then Della and Callaghan moved into their own apartment (55) around 1930 or 1931 (57).

She further explained that they "always talked about it [a wedding ceremony]"; but they continuously worked hard as building superintendents and they "were both so exhausted" that "[they] * * * continued living on that way * * * as man and wife" (58). She never asked him to marry her during all the years they lived together because, in her own words, "That didn't come up because it was an understanding that we loved one another anyway and I was contented to go along and I was happy that way" (58).

*Their Conduct and Reputation as Man and Wife*

Beginning in November or December 1928, their relatives, friends, associates, employers, creditors, and others knew and regarded them as "Mr. and Mrs. McSweeney" and dealt with them as a married couple.

1. Della's nieces, Marion Muscatello and Ethel McGlone, in both sworn and unsworn statements, allege that, from December 1928 to the date of Callaghan's death, Della and Callaghan continuously conducted themselves toward each other as man and wife and were treated as husband and wife by their friends and relatives (Exhs. 20, 21; Record, 71–76, 132–134).

2. Mary Connolly, now over seventy years old, submitted a notarized letter (Exh. 29) and gave testimony that, in the Christmas 1928 season, she met Della and Callaghan and that, on that occasion, Callaghan introduced Della as, "my wife, Mrs. McSweeney" (81); that she knew Della as "Mrs. McSweeney" in 1928 and in the years thereafter (149–150).

3. In a notarized letter (Exh. 26), William Roseingrave swore that he knew

Della and Callaghan as "Mr. and Mrs. McSweeney" since 1928.

4. In a notarized letter (Exh. 23), Alice Lord swore that "Mr. and Mrs. Callaghan and Della McSweeney" were in her employ in the years "from November, 1928 to September, 1934."

5. In testimony before the Veterans Administration, Mrs. Mary Erickson stated that she had known the couple since 1928 as "Mr. and Mrs. McSweeney" (Exh. 31; Record, 155).

6. Mrs. Florence Bradley submitted a letter (Exh. 28) stating that she visited the couple's home and that she knew the claimant as "Mrs. Della McSweeney since 1930" (148).

7. Margaret M. Flynn submitted a letter (Exh. 27) stating that Della and Callaghan were "one of the finest and devoted couples" and that she knew them as husband and wife since 1930 (146).

8. An employer's letter (Exh. 22) stated that, during the first five years they knew the couple, "his [Callaghan's] wife Della Callahan [sic] McSweeney resided with him" (138).

9. Beginning in 1940, when Della and Callaghan started to work as building superintendents they were always hired as "Mr. and Mrs. McSweeney" (Testimony of the Claimant, 63, 64).

10. Dr. J. F. Zendel treated the couple "as husband and wife from 1960 until Callaghan's demise in December 1962" (Exh. 30; Record, 65, 152).

11. Della and Callaghan went to church together every Sunday; they were known at the church as "Mr. and Mrs."; and they were recorded as "Mr. and Mrs. McSweeney" by the Catholic Charities (Testimony of the Claimant, 65–68).

12. Church correspondence was addressed to her as "Mrs. Delia [sic] McSweeney" (112) or as "Mrs. Calvin [sic] McSweeney" (Exh. 16; Record, 124).

13. Mail was addressed to the couple as "Mr. and Mrs. McSweeney"; and they lived together and entertained friends under that name (64, 69, 70, 122; Exhs. 14, 24, 25).

14. An envelope from the New York City Department of Welfare (Exh. 16) was addressed to the claimant as "Mrs. Dolia [sic] McSweeney" (112, 124).

15. In 1951 and 1955, the Household Finance Corporation recognized the couple as "Callahan [sic] McSweeney and Delia [sic] McSweeney, his wife" in connection with a loan and chattel mortgage (Exhs. 13, 14; Record, 120, 122).

16. The claimant testified (64) that they "always" filed joint income tax returns "as Callaghan and Delia [sic] McSweeney"; and the record refers to a "Notice of Income Tax Determination" for 1952 and 1953 addressed to "C. L. & D. McSweeney (Exh. 13; Record, 120); a "Statement of income tax due" for 1957 addressed to "C. & D. McSweeney" (Exh. 13; Record, 121); and to a "Notice of Adjustment," dated December 9, 1958, addressed to "Callaghan L. and Della McSweeney" (Exh. 19, Record, 131).

*Evidentiary Items Allegedly Tending to Prove that the Couple Were Not Man and Wife*

The record contains the following evidentiary items that, according to the administrative agency, tend to prove that Della and Callaghan were not man and wife and that they did not regard themselves as married to each other:

1. She sometimes used her maiden name after 1928. In her statement of February 20, 1963 to the administrative agency (Exh. 18; Record, 129–130), the claimant made the following explanation of why her maiden name "has always been on my [her] mailbox" and why she used her maiden name: "I continued to use my maiden name when I worked alone after our marriage. I had my references and social security card in the name of Hassett and that name has always been on my mailbox. I used McSweeney all other times." [See also her letter of August 1, 1963, wherein she admits using her maiden name a few times because her old references were in that name (38).]

2. On the following nine occasions, Della said she was single or not married, or used her maiden name or some other designation other than as Callaghan's wife:

| Document and Date | Della's Statement | Della's Explanation |
|---|---|---|
| Application for social security number (92) Nov. 15, 1936 | She said she was single. She used her maiden name. (104, 129–130) | "* * * because I was never 'legally' married and had no proof. * * * it was a delicate matter." (128) |
| Application for old-age insurance benefits (104, 106, 112) 9/25/58 | "No" to the question, "are you married?" (112) | |
| Application for admission of Callaghan to V.A. Hospital (Exh. 31) 11/62 | Her relationship was listed as "housekeeper—took care of patient". (153) | "I couldn't get myself to say that I was a common-law wife." (155) |
| Admission card for Callaghan to V.A. Hospital (Exh. 15) 11/62 | This lists Callaghan as "single" and "Della Hassett, Housekeeper" to be notified. (123) | "* * * I could not bring myself to say 'Common Law Wife'". (40) |
| Callaghan's death certificate (Exh. 11) 12/62 | He is listed as "single"; her relationship is noted as "friend"; she is described as the informant. (112) | "I never gave the information that he was single—* * * they must have misunderstood me." (Exh. 17; Record, 126) |
| Funeral contract 12/62 | She contracted for the funeral in her maiden name. She told the funeral home she was his housekeeper. (129) | Because of her "state of mind," she did "not know what" she was "doing or saying." (41) She told the funeral home she was his "housekeeper". "I was very confused." (Exh. 18; Record, 129) |
| Funeral bill (Exh. 12) 12/18/62 | Addressed to her as "Miss Della J. Hassett". (112, 118) | |
| Application to V.A. for a burial allowance (Exh. 31) | Signed in the name of "Della J. Hassett." (112, 154) | |

| Document and Date | Della's Statement | Della's Explanation |
|---|---|---|
| Application to V.A. for a widow's pension (Exh. 31) 1/63 | Signed as "Della Hassett" (112) | |

Della's Explanation in General

"* * * we did not know any of the laws concerning common law marriages until it was explained to me in your social security office by Miss Davidson * * *." (41)

"Regardless of the law, I didn't know anything about a common law wife—it never entered my mind that I was a common law wife and I didn't want to say it the last time either." (68)

3. On the following three occasions, Callaghan said he was single and referred to Della other than as his wife;

| Document and Date | Callaghan's Statement | Della's Explanation |
|---|---|---|
| His life insurance policy (Exh. 18; Record, 129) 1952 | He was single. She was named as beneficiary under her maiden name. (129) | He was "bashful" and "afraid of being asked for proof." (129) |
| Application for a veteran's pension (Exh. 31) 1961 | He was single. He named as his nearest relative "Miss Della Hassett, close friend." (153) | He was very bashful; he couldn't get proof of their marriage; and he was afraid that he would not get benefits if he said he was married because she was getting checks. (128, 129) |
| Application for old-age insurance benefits (Exh. 1) July 4, 1961 | He answered "no" to the question, "Are you married?" (87) | Same as above. |

Callaghan is, of course, not here to offer his own explanations for the above statements.

The court cannot say that the government was bound to accept Della's explanations for the numerous written

statements in which she described herself as "single," Callaghan's "friend" and "housekeeper," "Della Hassett," and in which Callaghan described himself as "single" and designated her by her maiden name as "close friend." Callaghan can no longer speak for himself. Only Della can shed direct light retrospectively on their intentions and motivations.

Della claims that the statements in question were the result of various factors: their ignorance of the law, their desire to avoid the social stigma of a common-law marriage, their fear of being unable to produce "proof" to substantiate a "legal" marriage, his bashfulness, his fear that his social security benefits might be lost if he disclosed that he was married and that she was getting such benefits in her own name, and her confusion immediately following his death. For these reasons, she contends that the statements should not be treated as adverse evidence.

These self-conferred words of description, in the light of all the circumstances surrounding the relationship, do permit a rational inference contrary to the one and only inference that Della says the government must draw. The administrative officer had before him substantial evidence, considering the record as a whole, on the basis of which he could have reasonably concluded, as he did, that the words used by Della and Callaghan were revelatory of the absence of a common law marriage and that Della's explanations of her and Callaghan's statements are not worthy of credence.

Despite the numerous biographic details suggestively revealed in the record, no one can be absolutely certain of the interplay of those forces—moral, social, religious, economic and erotic—that originated and shaped this couple's union. There are limits to the law's ability to probe the arcane recesses of their minds and hearts and to retrieve the evanescent remembrance of things past. The experience of life in and out of court teaches that human conduct is often vagarious; and that in matters of love memory is rarely accurate.[9]

The hearing officer's decision was a composite of his evaluation of the credibility of Della, her niece and a friend, all three of whom gave live testimony. It also reflected his reasoned judgment, based on probabilities, as to Della's and Callaghan's matrimonial intentions, dominant desires, mutual attitudes and the motivations for their way of life.

■■■■ The administrative decision kept within the fair bounds of reasonable inferences in the light of the entire record. There was a substantial basis for the findings and conclusions of the administrative agency considering the record as a whole. That being the case the findings and conclusions are final and binding; and that finality extends to inferences and conclusions drawn from the evidence. Adams v. Flemming, 276 F.2d 901, 903 (2d Cir. 1960). The burden of sustaining the claim for benefits was on the claimant. Adams v. Flemming, op. cit. supra.

In reaching the conclusion expressed in this opinion, the court has applied the substantial evidence rule, not as an "oft-repeated cliché" (Rocker v. Celebrezze, 358 F.2d 119, 124 [2d Cir. 1966], concurring opinion of Judge Moore), but on the basis of an evidentiary analysis and evaluation of the total record. Moreover, in so doing, the court has placed no reliance upon any possible "expertise" of the hearing examiner in this field, an

---

9. The distinction between an agreement "*per verba de praesenti*" and one "*per verba de futuro*" has evoked the following comment:

"Of all the people in the world lovers are the least likely to distinguish precisely between the present and the future tenses. In the middle ages marriages, or what looked like marriages, were exceedingly insecure. The union which has existed for many years between man and woman might with fatal ease be proved adulterous, and there would be hard swearing on both sides about 'I will' and 'I do'." II Maitland, The History of English Law (2nd ed. 1898) 368.

Of the four things considered beyond understanding by the ancient sages, one was "the way of a man with a young woman." Proverbs III, 19.

element as to which there may be some difference of judicial approach as indicated by the two opinions in Rocker v. Celebrezze, supra.

"The ultimate issue is reduced to one of credibility" and weighing conflicting inferences. Boyd v. Boyd, 252 N.Y. 422, 424, 169 N.E. 632 (1930).

In evaluating the conflicting evidence where the factual issue is the existence of a common-law marriage, alternative hypotheses may be reasonable. But in deciding the truth, the sophisticated and experienced trier of the facts who has observed the living witnesses "holds a position of advantage." Boyd v. Boyd, supra, 252 N.Y. at 429, 169 N.E. 632.

■ It is "not essential" to prove "the exact time and place" of the common-law marriage but the evidence must establish "the existence of the contract." Dodge v. Campbell, 135 Misc. 644, 654, 238 N.Y.S. 666 (Sup.Ct. Rensselaer Co., 1929). The Dodge case sets forth the applicable New York definition of a common-law marriage in the following language (135 Misc. at 651, 238 N.Y.S. at 673):

"'A common-law marriage' is defined as a present agreement between competent parties to take each other for husband and wife. * * * Such a marriage may be proved by showing actual cohabitation as husband and wife, the acknowledgment of the relationship, declarations, conduct, repute, reception among neighbors and the like. Gall v. Gall, 144 N.Y. 109, 118, 21 N.E. 106; Wilson v. Burnett, 105 Misc. 279, 172 N.Y.S. 673. Any mutual agreement between a man and woman to be husband and wife *in praesenti*, followed by cohabitation, constitutes a valid and binding marriage. * * * Marriage is a status which may be established by the words, actions, and lives of the parties, evidencing their understanding and intent. * * * With reference to the requirements of proof from which a common-law marriage may be inferred, Judge Rumsey, in Matter of Brush, 25 App.Div. 610,

49 N.Y.S. 803, 805, said: 'That agreement, if it is not proven in express terms by competent evidence, may be established by the fact of cohabitation and reputation among their friends and neighbors, and of recognition of each other as holding that relation. * * * But these facts, of themselves, do not constitute a marriage. They are simply evidence from which, if sufficiently strong, the courts are at liberty to infer that the cohabitation was the result of a previous agreement to become man and wife, and from that fact to infer further that a marriage actually existed between the parties.' "

Substantially the same exposition is contained in the well-known opinion in Matter of Erlanger, 145 Misc. 1, 3–9, 259 N.Y.S. 610 (Surr.Ct.N.Y.Co.1932). In the *Erlanger* case, the court also discussed the presumption in favor of marriage arising out of an apparently matrimonial cohabitation, especially one that is long-continuing (145 Misc. at 3–9, 259 N.Y.S. 610). At the same time, the court adverted (145 Misc. at 8, 259 N.Y.S. 610) to the presumption that a cohabitation illicit in its origin so continues until a change in its character is shown by acts and circumstances strongly indicating that the liaison has become matrimonial.

In Boyd v. Boyd, 252 N.Y. 422, 428, 169 N.E. 632, 634 (1930), the court made the following apposite statement:

"The validity of any alleged common-law marriage is always open to suspicion. Especially is doubt justified when one of the parties is dead. Clear, consistent, and convincing evidence is required to establish the fact."

The court's evaluation of the present record shows that the administrative agencies gave appropriate recognition to the above-mentioned evidentiary guidelines.

The record herein, of course, disclosed what might properly be regarded as contradictory and inconsistent positions. Whether these inconsistencies have been credibly explained away is a matter primarily for the fact-trier in the first in-

stance. Depending upon the other evidence in the case, the frequent use of a maiden name has been held not to be destructive of proof of a common-law marriage. In the Matter of the Estate of Maloy, 272 App.Div. 1084, 74 N.Y.S.2d 780 (3rd Dept. 1947), aff'd, 297 N.Y. 902, 79 N.E.2d 739 (1948). General ignorance of the legal significance of a common-law relation has been noted by the courts. Dodge v. Campbell, 135 Misc. 644, 653, 238 N.Y.S. 666 (Sup. Ct. Rensselaer Co. 1929). But in each case it is a process of "balancing the evidence" for one party "against that produced by the" other party and deciding whether "a logical explanation of the acts and declarations" of the alleged common-law spouse "despite their inconsistency, bears the stamp of truth." Dodge v. Campbell, supra at 135 Misc. 653–654, 238 N.Y.S. at 676.

The plaintiff's motion is hereby denied. So ordered.